No. 05-069

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 72

_____

MONTANA TROUT UNLIMITED; MCGUIRE'S
SOUTH FORK, LLC; FREDRICK C. BUCKINGHAM;
JUANITA POLSTON; BOYD STANLEY; HUGH HASTING;
WILL KURTZ; EDWIN MORGENS; HIGH LONESOME
RANCH, LP; HENRY C. McMICKING; MIKE GEARY
d/b/a SMITH RIVER OUTFITTERS, PRO OUTFITTERS; and
MONTANA RIVER ANGLERS, LLC,

        Petitioners and Appellants,

    v.

MONTANA DEPARTMENT OF NATURAL RESOURCES
AND CONSERVATION; ARTHUR R. CLINCH, as its Director;
and JACK STULTS, as Administrator of its Water Resources
Division,

        Respondents and Respondents,

    and

RIVERSIDE RANCH, CO.; LOUISE GALT, and
WILLIAM GALT,

        Intervenors.

_____

APPEAL FROM:    District Court of the First Judicial District,
                In and for the County of  Lewis and Clark, Cause No. ADV-2003-444
                The Honorable Dorothy McCarter, Judge presiding.

COUNSEL OF RECORD:

    For Appellants:

        Peter Michael Meloy, Jennifer S. Hendricks and Robin McGuire, Meloy
        Trieweiler, Helena, Montana

For Respondents:

      Tim D. Hall, Special Assistant Attorney General, Department of Natural Resources and Conservation, Helena, Montana

For Intervenor Riverside Ranch:

      David R. Stewart and John E. Bloomquist, Doney Crowley Bloomquist Payne Uda, P.C., Helena, Montana

For Intervenor Galt:

      Russell McElyea and Jennifer L. Farve, Moore, O'Connell & Refling, P.C., Bozeman, Montana

_____

Submitted on Briefs:  January 18, 2006

Decided:  April 11, 2006

Filed:


_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1      Montana Trout Unlimited and eleven other petitioners (hereafter collectively "Trout Unlimited") appeal from the decision of the District Court for the First Judicial District, Lewis and Clark County, granting summary judgment in favor of the Montana Department of Natural Resources and Conservation (DNRC) and Intervenors Riverside Ranch Co., Louise Galt and William Galt.  We reverse and remand.

¶2      Trout Unlimited presents the following issues on appeal:

¶3      1.  Whether Trout Unlimited was required to exhaust its administrative remedies before seeking judicial relief.

¶4      2.  Whether DNRC's interpretation of "immediately or directly connected to surface water" in the Basin Closure Law is correct as a matter of law.

## FACTUAL BACKGROUND

¶5      Montana state law provided two possible ways of perfecting a water right before 1973.  A claimant could post a notice at the point of diversion and file a notice with the county clerk pursuant to statute, Mont. Laws 1885, secs. 6 through 10; R.C.M. (1947), 89-810 through -814.  The second method required the claimant simply to put the water to use.  *See Murray v. Tingley* (1897), 20 Mont. 260, 50 P. 723.  The adjudication of these rights became increasingly cumbersome and complex as the number of appropriators claiming water rights in Montana increased.

¶6      The 1972 Montana Constitutional Convention sought to remedy Montana's antiquated appropriation system.  The 1972 Constitution contained a directive to the legislature that it "shall provide for the administration, control, and regulation of water

3

rights and shall establish a system of centralized records, in addition to the present system of local record." Art. IX, Sec. 3(4), Mont. Const. The legislature promptly responded by passing the 1973 Montana Water Use Act (Act), 1973 Mont. Laws 452; Sections 85-2-212 to -907, MCA.

¶7 The Act mandated that all holders of claims to existing water rights file their claims with the DNRC. The Act charged DNRC with determining the priority dates for each filed claim. The Act further charged DNRC with inspecting conflicts concerning the priority of claims. The legislature established water courts for the adjudication of disputed claims. Once water courts adjudicated existing water rights and DNRC filed water rights according to a priority date, the Act required new claimants to establish their claims through statutory filing procedures. DNRC determined the priority of post-1973 claims based on the date of filing. It became clear as this new system developed that there were significantly more adjudicated and legitimate non-adjudicated claims to water than there was available water.

¶8 The legislature responded to this crisis by enacting a moratorium on new applications in the over-appropriated basins. The legislature included a basin closure for the Upper Missouri River basin, encompassing the drainage area of the Missouri River and its tributaries above Morony Dam. Sections 85-2-342 and -343, MCA. The Smith River is a tributary of the Upper Missouri River and subject to the Upper Missouri River basin moratorium (hereafter Basin Closure Law).

¶9 The Basin Closure Law provides that DNRC may not "process or grant an application for a permit to appropriate water . . . within the upper Missouri River basin

4

until the final decrees have been issued . . . ." Section 85-2-343, MCA. The legislature provided for several exceptions to the general ban on processing or granting applications. New groundwater applications represent one of the exceptions. Section 85-2-343(2)(a), MCA. The legislature recognized, however, that some groundwater bears a close relationship with surface water and that allowing unrestricted appropriations of groundwater would defeat the purpose of the Basin Closure Law. Thus, the Basin Closure Law also forbids the processing of new applications for groundwater that is "immediately or directly connected" to the Upper Missouri River basin's surface water. Sections 85-2-342 and -343, MCA.

¶10    DNRC recognized the particularly intimate relationship between groundwater and surface water along the Smith River. DNRC prepared a Supplemental Environmental Assessment (Supplemental EA) for the Smith River Basin in February of 2003. Therein DNRC noted that the Smith River and its principal tributaries are hydrologically connected to groundwater. The Supplemental EA further noted two ways that groundwater pumping affects surface stream flows. First, pumping may intercept groundwater that otherwise would have entered the stream thereby causing a reduction in surface flows. This phenomenon is called the prestream capture of tributary groundwater. Second, groundwater pumping may pull surface water from the stream toward the well. The DNRC refers to this pulling as induced infiltration. DNRC's hydrogeologist reports that a stream takes longer to recover from prestream capture of its tributary groundwater than from depletion through induced infiltration.

¶11    New irrigation developers began turning to groundwater to supplement limited

5

surface water supplies in closed basins. DNRC, as the agency charged with implementation of the Basin Closure law, reviews groundwater applications. Sections 85-2-112 and -113, MCA. DNRC must determine whether an application for groundwater includes groundwater that is "immediately or directly connected to surface water" for the application to qualify under the groundwater exception to the Basin Closure Law. Sections 85-2-342 and -343, MCA. The legislature did not define "immediately or directly connected to surface water" in the Basin Closure Law. Section 85-2-342, MCA. DNRC interpreted the language to mean that a groundwater well could not pull surface water directly from a stream or other source of surface water. This interpretation makes no mention of the potential influence of the prestream capture of tributary groundwater on surface flow. DNRC processed new applications before making a threshold determination that the applications fell within an exception to the Basin Closure Law. It is against this backdrop that Trout Unlimited initiated its suit against DNRC.

## PROCEDURAL BACKGROUND

¶12 Trout Unlimited sought a writ of mandate to require DNRC to refrain from processing groundwater applications on the Upper Missouri River basin until it had made the threshold determination that the groundwater was not "immediately or directly connected to surface water" rather than deferring that determination until it had analyzed other permit criteria. Trout Unlimited further argued that DNRC had adopted an inappropriately narrow interpretation of the "immediately or directly connected to surface water" language in the Basin Closure Law by considering groundwater to have an

6

immediate or direct connection to surface water only if it induced infiltration.

¶13 The District Court determined that DNRC had a clear legal duty to abide by the Basin Closure Law by making the threshold determination of whether the application qualified under the groundwater exception, but indicated that it needed additional evidence regarding whether DNRC was complying with that duty. Trout Unlimited and DNRC ultimately entered into a stipulation wherein DNRC agreed that it would make a threshold determination of whether an application for a groundwater permit was immediately or directly connected to surface water. DNRC still adhered, however, to its interpretation of "immediately or directly connected to surface water" by only including induced infiltration of surface water.

¶14 The substantive dispute over DNRC's interpretation of "immediately or directly connected to surface water" remained in the form of Count II of Trout Unlimited's Amended Petition. Trout Unlimited sought a declaratory judgment that DNRC's interpretation of the Basin Closure Law conflicted with the clear statutory language of §§ 85-2-342 and -343, MCA. DNRC had embodied its interpretation only in a series of letters written by agency officials at the time that Trout Unlimited filed its Amended Petition. DNRC had not yet established its interpretation of the language in the Basin Closure Law through the Montana Administrative Procedures Act (MAPA).

¶15 DNRC finally went through the administrative rulemaking process while this litigation was pending. DNRC defined "immediately or directly connected to surface water" to mean "ground water which, when pumped at the flow rate requested in the application and during the proposed period of diversion, induces surface water

7

infiltration." Rule 36.12.101(33), ARM. DNRC's formal definition again ignored water diverted from streams through prestream capture of tributary groundwater. The substantive issue on appeal remains whether DNRC erred in its interpretation of "immediately or directly connected to surface water" in the Basin Closure Law.

¶16 The District Court granted DNRC's motion for summary judgment on Count II of Trout Unlimited's Amended Petition. The court concluded that Trout Unlimited had failed to exhaust its administrative remedies before bringing an action in district court. The court further concluded that the definitions and methods involved in processing water use applications lie within DNRC's discretion and deferred to DNRC's administration of the statutory provisions contained in §§ 85-2-342 and -343, MCA. This appeal followed.

## STANDARD OF REVIEW

¶17 We review a district court's decision to grant summary judgment *de novo*, based on the same criteria applied by the district court. *Hardy v. Vision Service Plan*, 2005 MT 232, ¶ 10, 328 Mont. 385, ¶ 10, 120 P.3d 402, ¶ 10. We must determine whether the district court applied the law correctly. *Hardy*, ¶ 10.

## DISCUSSION

¶18 *1. Whether Trout Unlimited was required to exhaust its administrative remedies before seeking judicial relief.*

¶19 The District Court concluded that Trout Unlimited was required to exhaust its administrative remedies before pursuing declaratory relief in district court. The District Court ruled that Trout Unlimited should have pursued its available administrative

8

remedies by objecting to a groundwater application with the DNRC, thereby creating a contested case proceeding. In that way, the District Court reasoned, Trout Unlimited properly could seek judicial review of DNRC's final decision following the contested case proceeding. Trout Unlimited argues that the futility exception excuses the normal exhaustion requirement. Specifically, Trout Unlimited argues that the Basin Closure law prohibits even the processing of applications for groundwater that is "immediately or directly connected to surface water" and that requiring Trout Unlimited to wait for DNRC to process an application and then seek a contested case hearing flouts the legislature's intent.

¶20   If a statute provides for administrative relief, an aggrieved party must seek that relief from the administrative body and exhaust the statutory remedy before seeking judicial relief. *Wiser v. State Dept. of Commerce*, 2006 MT 20, ¶ 30, 331 Mont. 28, ¶ 30, 129 P.3d 133, ¶ 30. We will not require exhaustion of administrative remedies, however, when resort to an administrative remedy would be futile. *DeVoe v. Department of Revenue* (1993), 263 Mont. 100, 115, 866 P.2d 228, 238; § 1-3-223, MCA.

¶21   The Montana Water Use Act provides a statutory remedy for challenges to groundwater applications. Sections 85-2-308 and -309, MCA. Section 85-2-308, MCA, outlines the filing procedures for objections to an application, and § 85-2-309, MCA, provides for contested case hearings on those objections. MAPA affords an aggrieved party the opportunity to file an appeal to the district court once DNRC reaches a final agency decision. Section 2-4-702(1)(a), MCA. MAPA also provides, however, that a "preliminary, procedural, or intermediate agency action or ruling is immediately

reviewable if review of the final agency decision would not provide an adequate remedy." Section 2-4-701, MCA.

¶22 Trout Unlimited argues that review of a final decision by DNRC on its decision to process a groundwater application would not provide an adequate remedy. Trout Unlimited maintains that the language of the Basin Closure Law providing that the DNRC "may not *process* or grant an application for a permit to appropriate water . . ." prohibits the processing of an application for groundwater that has an immediate or direct connection to surface water. Section 85-2-343(1), MCA (emphasis added). Trout Unlimited argues that allowing DNRC to process an application before Trout Unlimited can seek review defeats the intent of the Basin Closure Law. We agree.

¶23 We must endeavor to avoid a statutory construction that renders any section of the statute superfluous or fails to give effect to all of the words used. *Mattson v. Montana Power Co.*, 2002 MT 113, ¶ 10, 309 Mont. 506, ¶ 10, 48 P.3d 34, ¶ 10. It is blackletter law that in the construction of a statute, the office of a judge is simply to ascertain and declare what is in terms or in substance contained therein, not to omit what has been inserted or insert what has been omitted. *City of Billings v. Gonzales*, 2006 MT 24, ¶ 8, 331 Mont. 71, ¶ 8, 128 P.3d 1014, ¶ 8.

¶24 The legislature expressly prohibits the processing of applications for groundwater that is immediately or directly connected to surface water in the Upper Missouri River basin. Sections 85-2-342 and -343, MCA. DNRC recognizes this legislative ban on processing applications in its administrative regulations. Rule 36.12.120(1) of the Administrative Rules of Montana provides that in "the numerous basin closure areas in

10

Montana, the department cannot process an application unless it qualifies as a basin closure exception." To require exhaustion of administrative remedies before allowing Trout Unlimited to seek judicial relief from DRNC's decision to process an application for groundwater with an immediate or direct connection to surface water would ignore the plain language of the Basin Closure Law and DNRC's regulations by effectively omitting the word "process" from § 85-2-343, MCA, and Rule 36.12.120(1), ARM. We cannot ignore the plain statutory language prohibiting DNRC from processing such applications.

¶25 Exhaustion of administrative remedies would require Trout Unlimited to stand by while DNRC processed a groundwater application that did not fall within an exception to the Basin Closure Law. DNRC could process an application for groundwater even though that groundwater is "immediately or directly connected to surface water." Trout Unlimited eventually could refute DNRC's determination to process an application. Rule 36.12.120(4), ARM. The regulations do not provide for immediate judicial relief, however, following an objection to DNRC's decision to process an application. Rather, Trout Unlimited's objection would create a contested case, triggering the requirement of a contested case hearing. Section 85-2-309, MCA. If Trout Unlimited objected to DNRC's final decision following the contested case hearing it could then seek judicial relief. Section 2-4-702, MCA. DNRC never would be prevented from processing applications that do not fall within an exception to the Basin Closure Law, and Trout Unlimited would be forced to participate in an agency proceeding that Basin Closure Law expressly prohibits.

¶26 Trout Unlimited's only avenue for relief at the time it initiated this lawsuit was through objections to DNRC's decision to process individual applications. DNRC had failed to codify a rule outlining when groundwater is "immediately or directly connected to surface water" through the MAPA rulemaking process. DNRC's Director, Bud Clinch, outlined the DNRC's interpretation of "immediately or directly connected to surface water" in a letter to the Meagher County Conservation District Administrator in April of 2002.

¶27 This policy statement is not a rule, however, for purposes of MAPA. An agency must give written notice of its intended action prior to the adoption of any rule. Section 2-4-302, MCA. Nothing in the record indicates that DNRC provided written notice in advance of Director Clinch's letter regarding the DNRC's intended action in processing groundwater applications along the Smith River. Trout Unlimited could not seek to challenge DNRC's interpretation under § 2-4-506, MCA. And, as the District Court noted, "waiting for the applications to be issued before challenging them administratively or in district court would be ineffective in preventing immediate harm to the surface water."

¶28 Moreover, Trout Unlimited could object to DNRC's decision to process an application and initiate a contested case hearing only to have that application denied for other reasons. For example, after DNRC determines to process an application for groundwater, it must evaluate the application under § 85-2-311, MCA. This section outlines criteria, often called the "311 criteria," that an applicant must satisfy before DNRC can issue them a permit to appropriate water. One of the 311 criteria requires that

12

a new appropriation not adversely affect prior appropriators' water rights. Section 85-2-311(1)(b), MCA.

¶29 A new groundwater appropriation that is "immediately or directly connected to surface water" by inducing water out of the stream also would affect senior appropriators' water supply in an over-appropriated basin such as the Upper Missouri River basin. Section 85-2-311(1)(b), MCA, would oblige DNRC to reject such an application due to its effect on the water supply available to senior appropriators. Thus, an application that DNRC never should have processed because of its connection to surface water could be denied because of its affect on senior water rights holders. This denial of a new groundwater application for reasons other than its effect on surface water would preclude Trout Unlimited's ability to appeal DNRC's decision to process the application in the first place.

¶30 The Basin Closure Law serves, in part, to protect senior water rights holders in the Upper Missouri River basin. *See, e.g.,* § 85-2-308(3), MCA (providing standing to object to water use applications to individuals whose property, water rights, or interests are adversely affected by the proposed application). The proscription against processing applications saves appropriators the time and expense of having to defend their water rights every time a new applicant seeks to appropriate water in the basin. For example, defending property interests in contested case hearings generally requires retained counsel, expert witnesses, time, and expenses. The legislature provided interested parties with greater protection than the right to file objections and proceed to contested case hearings by insulating them from the burden and expense of the objection process.

13

¶31 We therefore conclude that the futility exception to the exhaustion requirement relieves Trout Unlimited from having to exhaust their administrative remedies before seeking judicial relief. *DeVoe*, 263 Mont. at 115, 866 P.2d at 238. We will not require Trout Unlimited or other objectors to participate in agency proceedings that the legislature expressly prohibits. DNRC must adhere to the legislature's proscription on processing applications that do not fall within an exception to the Basin Closure Law. To require Trout Unlimited or other objectors to wait for DNRC to process applications, the very act prohibited by statute and by DNRC's own regulations, and then participate in costly administrative proceedings would be futile, especially in light of the 311 criteria and the multiple other factors upon which DNRC ultimately could deny an application. The fact that DNRC's final decision would not provide Trout Unlimited with an adequate remedy relieves Trout Unlimited of the requirement to exhaust its administrative remedies before seeking a declaratory judgment in district court. Section 2-4-701, MCA; *DeVoe*, 263 Mont. at 115, 866 P.2d at 238.

¶32 The Dissent argues that we misread the relevant statutes. Dissent, ¶¶ 47-50. In particular, the Dissent cites § 85-2-343, MCA, of the Basin Closure Law, that provides, in part, that "subject to the provisions of subsection (2) of this section, the department may not process or grant an application for a permit to appropriate water . . . within the Upper Missouri River basin until the final decrees have been issued . . . ." Subsection (2) in turn provides that the "provisions of subsection (1) do not apply to . . . an application for a permit to appropriate ground water." The Dissent argues that this language compels DNRC to process all groundwater applications, effectively eliminating such applications

14

from the proscription against processing set forth in the Basin Closure Law. This interpretation ignores the statutory definition of "groundwater" provided in § 85-2-342, MCA.

¶33 The legislature defined groundwater as "water that is beneath the land surface or beneath the bed of a stream, lake, reservoir, or other body of surface water and that *is not immediately or directly connected to surface water*." Section 85-2-342(2), MCA (emphasis added). Subsection (2) of § 85-2-343, MCA, therefore allows DNRC to process applications for groundwater only where that groundwater has no immediate or direct connection to surface water. DNRC acknowledges that it must make this threshold determination of whether a groundwater application falls within an exception to the Basin Closure Law. Rule 36.12.120(1), ARM. Under the Dissent's interpretation, however, DNRC must process all groundwater applications regardless of their connection to surface water. This interpretation ignores the legislature's definition of groundwater in § 85-2-342(2), MCA, contradicts the legislative proscription against processing applications for groundwater with an immediate or direct connection to surface water in the Basin Closure Law, and ignores DNRC's own regulations in Rule 36.12.120(1), ARM. The Dissent's interpretation also would deny potential objectors the legislative protection against processing applications for groundwater that do not fall within an exception to the Basin Closure Law.

¶34 *2. Whether DNRC's interpretation of "immediately or directly connected to surface water" in the Basin Closure Law is correct as a matter of law.*

¶35 The District Court noted that the legislature chose not to define "immediately or

15

directly connected to surface water" in the Basin Closure Law. The court concluded that "the definitions and methods involved in processing the petitioners' water use applications are to be determined by, and lie within, the discretion of the DNRC." The court did not analyze, however, whether DNRC abused its discretion in its interpretation of the Basin Closure Law. Trout Unlimited argues that DNRC abused its discretion by failing to interpret the statutory language in a manner consistent with the legislature's intent. Specifically, Trout Unlimited argues that by failing to recognize the direct effect of prestream capture of tributary groundwater DNRC fails to give meaning to each word in the Basin Closure Law.

¶36 Whenever a state agency has authority to adopt rules to implement the provisions of a statute, the agency's rule "is not valid or effective unless it is . . . consistent and not in conflict with the statute; and reasonably necessary to effectuate the purpose of the statute." Section 2-4-305(6), MCA. We evaluate whether the agency's interpretation adhered to the statutory language when determining whether the agency met this standard. *See Board of Barbers, Etc. v. Big Sky College, Etc.* (1981), 192 Mont. 159, 162, 626 P.2d 1269, 1271.

¶37 Intervenors assert that we must show deference and respect to the responsible agency's statutory interpretations. We recently evaluated the origin of the rule granting deference to agencies when administering statutes in *Montana Power Co. v. Montana Public Services Com'n*, 2001 MT 102, 305 Mont. 260, 26 P.3d 91. We traced the rule to its source and determined that deference to agencies is most appropriate when the agency interpretation has stood unchallenged for a considerable length of time, thereby creating

16

reliance in the public and those having an interest in the interpretation of the law. *Montana Power Co.*, ¶ 24. Even then, however, such administrative interpretations would not necessarily be binding on the courts. *Montana Power Co.*, ¶ 25. Rather, we accord such long-standing administrative interpretations "respectful consideration." *Montana Power Co.*, ¶ 25, quoting *Doe v. Colburg* (1976), 171 Mont. 97, 100, 555 P.2d 753, 754.

¶38 DNRC promulgated rules interpreting the Basin Closure Law for the Upper Missouri River basin while this lawsuit was pending. The regulations did not go into effect until January 1, 2005. DNRC's interpretation of the Basin Closure Law and, more specifically, the meaning of "immediately or directly connected to surface water" have therefore not enjoyed a longstanding agency interpretation entitling it to a higher level of deference. *Montana Power Co.*, ¶ 25. We thus focus our inquiry on whether the agency's interpretation is correct as a matter of law in the absence of such a longstanding agency interpretation. *Montana Power Co.*, ¶ 27.

¶39 The legislature prohibited the processing or granting of applications for permits to appropriate water within the Upper Missouri River basin until the final decrees have been issued, unless the application falls within one of the statutorily prescribed exceptions. Section 85-2-343, MCA. The legislature defined the groundwater exception in the conjunctive as "water that is beneath the land surface or beneath the bed of a stream, lake, reservoir, or other body of surface water and that is not immediately *or* directly connected to surface water." Section 85-2-342(2), MCA (emphasis added). The plain language of the statute demonstrates the legislature's intent to prohibit the processing or

17

granting of applications for groundwater that either has an immediate connection to surface flows or has a direct connection to surface flows, or both. The legislature did not define "immediately or directly connected to surface water."

¶40 DNRC's interpretation of "immediately or directly" indicates that DNRC considers groundwater to have an immediate or direct connection to surface water if groundwater "pumped at the flow rate requested in the application and during the proposed period of diversion, induces surface water infiltration." Rule 36.12.101(33), ARM. This formal interpretation comports with the informal interpretation embodied in Director Clinch's letter. DNRC's interpretation of "immediately or directly connected" therefore fails to account for impacts to surface flow caused by the prestream capture of tributary groundwater.

¶41 DNRC's own hydrogeologist recognized the impact to surface flows caused by the prestream capture of tributary groundwater. Bill Uthman (Uthman) of DNRC's Water Management Bureau drafted a memo to the Water Resources Division outlining the hydrologic interactions that occur between groundwater and surface water and how groundwater development may impact surface water. Uthman explained therein that groundwater pumping produces two separate components that contribute to total streamflow depletion:

> The first component, groundwater capture, is interception of groundwater flow tributary to the stream, that ultimately reduces the hydraulic gradient near the stream and baseflow to the stream. *Streamflow depletion from groundwater capture usually continues after pumping ends and may require long periods of time to recover.* The second component, induced streambed infiltration, *usually has less impact on streamflow depletion*, and its effects dissipate soon after pumping ends. [Emphasis added.]

18

As evidenced by DNRC's own hydrogeologist, not only does the prestream capture of tributary groundwater have an impact on surface flows, it has a more significant and longer lasting impact than does induced infiltration.

¶42 Uthman further concluded that "immediately or directly connected" could be interpreted to mean "an immediate and direct, physical capture and depletion of surface water by a well or infiltration structure, including the interception of groundwater tributary to surface water." DNRC also recognized that the prestream capture of tributary groundwater can reduce surface flows in its February 2003 Supplemental EA. DNRC noted that prestream capture occurs more gradually, and impacts streams, like the Smith River, that are hydrologically connected to an aquifer. DNRC failed to account for the direct connection between surface flows and the prestream capture of tributary groundwater in its implementation of the Basin Closure Law despite possessing a wealth of information supporting the connection.

¶43 The legislature provided an exception to the Basin Closure Law for groundwater, provided it is not "immediately or directly connected to" the Upper Missouri River's surface flow. DNRC's interpretation of the Basin Closure Law conflicts with the statute, and does not provide sufficient protection to reasonably effectuate its purpose. Section 2-4-305(6), MCA. DNRC's interpretation recognizes only immediate connections to surface flow caused by induced infiltration and ignores the less immediate, but no less direct, impact of the prestream capture of tributary groundwater. The Basin Closure Law serves to protect senior water rights holders and surface flows along the Smith River basin. It makes no difference to senior appropriators whether groundwater pumping

19

reduces surface flows because of induced infiltration or from the prestream capture of tributary groundwater. The end result is the same: less surface flow in direct contravention of the legislature's intent.

¶44 We therefore reverse and remand for further proceedings consistent with this opinion.

/S/ BRIAN MORRIS

We Concur:

/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON

Chief Justice Karla M. Gray dissenting.

¶45 I respectfully dissent from the Court's conclusions that Trout Unlimited need not exhaust any administrative remedies before seeking judicial relief and that the District Court erred as a matter of law in concluding otherwise. In my view, the Court's decision rests on a simple misreading of the plain language of the primary statutes at issue here. As a consequence, I also dissent from the Court's resolution of the substantive matter presented in the second issue, which I believe must await another day.

¶46 I agree with the Court that, if a statute provides for administrative relief, an aggrieved party must seek that relief from the administrative body and exhaust the statutory remedy before seeking judicial relief. I also agree with the Court that statutory remedies exist for challenging applications for permits for ground water, and that objections to such applications are subject to contested case proceedings by means of

20

which the objections can be addressed; ultimately, an aggrieved party--that is, a party who is actually aggrieved because objections have not been successful--may seek judicial review of a final agency decision. I would apply these statutes to the present case. I also would address--and reject--application of the futility doctrine here.

¶47 In the present case, Trout Unlimited argues that it should not be subjected to the rules, statutes and procedures which govern challenges to--and remedies for challenges to--groundwater applications. It maintains that it should prevail, without seeking administrative remedies, by a mere plain language interpretation of the Basin Closure Law (BCL). The Court agrees, based on the language contained in § 85-2-343(1), MCA--part of the BCL--that the DNRC cannot "process . . . an application for a permit to appropriate water" in the Upper Missouri River Basin until a final decree is issued. I most certainly do not agree.

¶48 It is important to start with a clear understanding of the statutes at issue here, which are part of the BCL. In that regard, § 85-2-342(1), MCA, defines the term "[g]round water" as "water that is beneath the land surface or beneath the bed of a . . . body of surface water *and that is not immediately or directly connected to surface water*." (Emphasis added.)

¶49 Section 85-2-343(1), MCA, the substantive statute regarding the Upper Missouri River Basin closure, provides in pertinent part that "*subject to the provisions of subsection (2) of this section*, the department may not process or grant an application for a permit to appropriate water" within the Basin. Subsection (2)(a) of § 85-2-343, MCA, states that "[t]he provisions of subsection (1) *do not apply to . . . an application for a*

21

*permit to appropriate ground water*[.]" (Emphasis added.)  The plain and simple language of this statute, therefore, means that the prohibition against processing applications for water permits contained in subsection (1) has no application to an application for a permit to appropriate ground water.  In my view, this plain language necessitates a conclusion that the DNRC can "process" an application for a permit to appropriate ground water.   Statutes are not always clear, but these are crystal clear.

¶50     The Court's interpretation of the statutes simply overlooks the language in § 85-2-343(1), MCA, that, notwithstanding the prohibition against DNRC's processing and granting an application for a permit to appropriate water in the Upper Missouri River Basin, the subsection is "subject to the provisions of subsection (2) of this section[.]" More importantly, the Court totally ignores that portion of § 85-2-343(2)(a), MCA, that the "provisions of subsection (1) *do not apply* to an application for a permit to appropriate ground water[.]"  (Emphasis added.)

¶51     Thus, faced with an application for a permit to appropriate ground water, the DNRC is obligated to begin processing it.  If there are objections to the application-- based on whether the water sought is actually "ground water," or on any other basis--the DNRC must follow the procedures set forth in §§ 85-2-307, -308 and -309, MCA, the very statutes which the Court concedes provide a statutory remedy for challenges to such an, application; respectively, those statutes require notice of the application, acceptance of timely filed objections and, under delineated circumstances, a contested case hearing. Judicial review is available for a party aggrieved by the DNRC's final decision. *See* § 2-4-702(1)(a), MCA.

¶52    Trout Unlimited seeks to avoid exhausting these procedures on the grounds that resort to an administrative remedy would be futile.  The Court agrees, relying on *DeVoe v. Department of Revenue* (1993), 263 Mont. 100, 866 P.2d 228 (*DeVoe II*) only after spinning out several speculative scenarios which might cause an application to be denied for other reasons.  I submit that one could always raise specters--via speculation--that would prevent a party in a contested case from prevailing or from having their particular issue fully addressed.  I further submit that this kind of rationale--accepted by the Court here--likely will mark the beginning of the end of administrative processes, remedies and judicial review as they have existed in Montana for many years.  Thus, I turn to the Court's reliance on *DeVoe II*, which is decidedly misplaced.

¶53    The *DeVoe* litigation actually began with challenges by DeVoe to DOR's assessment of his commercial apartment properties in 1980, 1981, 1982, 1983 and 1984.  Unsuccessful at the county tax appeal board in virtually all regards, DeVoe appealed to the state tax appeal board, which consolidated the cases for all years and upheld the county board's decisions.  DeVoe sought judicial review in the district court, which upheld the state board with one exception; the court remanded the 1983 tax year to the state board.  DeVoe appealed to this Court, which reversed the district court and directed it to remand to the state board.  *DeVoe v. Department of Revenue* (1988), 233 Mont. 190, 759 P.2d 991 (*DeVoe I*).

¶54    In the present case, the Court relies on *DeVoe II*.  There, the appraised value of DeVoe's two properties more than doubled in 1986 from the 1985 appraisals.  DeVoe appealed the changes to the county tax appeal board which, in a one-sentence decision,

denied the appeals based on taxable valuation. The county board did not mention the assessed valuations, which were the subject of DeVoe's appeals. He appealed to the state tax appeal board, which denied his appeal for failure to sustain his burden of establishing error in 1986. DeVoe then sought judicial review in the district court and the court upheld the state board's decision. Shortly thereafter, we issued our decision in *DeVoe I* and, in light thereof, DeVoe moved for an amended judgment; the district court reversed itself and remanded to the state board. The second state board decision was issued in August of 1991 and, again, was adverse to DeVoe who then again sought judicial review. He contended that the state board's decision denying his appeal of the appraised valuations constituted exhaustion of his administrative remedy for all of the years included in the appraisal cycle to which those valuations applied. The district court agreed, since DeVoe had attempted to appeal the assessments for the years after 1986 to the county board and the state board, but those entities would not consider his appeals based on an administrative rule which made the DOR's appraisal binding for the remaining years of the appraisal. On appeal to this Court, and against such a nightmarish backdrop, we determined that DeVoe had attempted to exhaust his administrative appeals but was unable to do so. "To require DeVoe to exhaust more administrative remedies than he has already exhausted would be a useless act, and neither law nor equity require useless acts." *DeVoe II*, 263 Mont. at 115, 866 P.2d at 238.

¶55     It is unnecessary to point out at length that the facts and circumstances in *DeVoe II* bear no resemblance whatsoever to the facts of the present case for purposes of applying, as the Court does, the futility doctrine here. DeVoe had sought administrative remedies

24

for a decade. Trout Unlimited has sought none. Indeed, the Court does not really contend otherwise. It rests its decision regarding futility on the statement that Trout Unlimited and other objectors should not be required to participate in agency proceedings "that the legislature expressly prohibits." As discussed above, the Legislature has not expressly prohibited the proceedings at hand. Having pointed out the errors in the Court's statutory interpretation, it would be futile to do so again here. I cannot understand the Court's willingness to allow Trout Unlimited to avoid the very statutory proceedings and remedies we all agree exist. If Trout Unlimited can do so, why should anyone--or any entity--have to comply with legislative mandates in the administrative arena or at all?

¶56 There is, in my view, an intermediate position regarding the extent to which Trout Unlimited--and others--must adhere to the generally applicable administra-tive procedures and remedies enacted by the Legislature. While it has not been raised, I offer it as another basis for avoiding the Court's overly broad decision that application of the futility doctrine is appropriate here.

¶57 Section 35-2-309(1), MCA, provides that if the DNRC determines that an objection to an application for a permit is a valid objection, the DNRC must hold a contested case hearing. That a hearing must be held upon a determination that an objection is a valid objection necessitates that the converse also must be true; that is, the DNRC may determine that an objection does *not* state a valid objection, thereby--if there is only the one objection--negating the requirement for a contested case. In such a circumstance, the objector has been precluded from further involvement in proceedings

on the application. At that point, waiting for a final agency determination may well be futile and, if a contested case hearing were to go forward on other objections, the "aggrieved" objector would be out of the game. Under such a circumstance, it is my view that § 2-4-701, MCA, would come into play. Section 2-4-701, MCA, states that a "preliminary, procedural, or intermediate agency action or ruling is immediately reviewable if review of the final agency decision would not provide an adequate remedy." Immediate review under such circumstances would be efficient for all concerned and would provide an adequate remedy within the boundaries of the existing statutory administrative procedures.

¶58 In summary, it is my view that the Court improperly interprets the BCL in the first instance and then bases its application of the futility doctrine on that erroneous interpretation. I cannot agree with this wholesale repudiation of the statutory procedures and remedies provided by the Legislature in the critical arena of water rights. On this record, I would affirm the District Court's determinations that, where available, administrative remedies must be exhausted prior to bringing a declaratory judgment action and that here, summary judgment against Trout Unlimited is proper. I dissent from the Court's failure to do so.

/S/ KARLA M. GRAY

Justice Jim Rice joins in the foregoing dissenting Opinion of Chief Justice Gray.

/S/ JIM RICE

Justice John Warner specially concurs.

¶59 I find both the Opinion and the dissent singularly confusing. The Court's Opinion interchangeably uses the term "ground water"[1] to mean both "water that comes out of the ground" and "water that comes out of the ground and is not connected to surface water." The second meaning is the particular way ground water is described in § 85-2-342(2), MCA. The dissent refuses to recognize that it would be futile for Trout Unlimited to go back to DNRC for administrative proceedings without a direct statement of why. Thus, I write to briefly state the reasons I concur with the Court.

¶60 Both the Court and the dissent agree that the Upper Missouri River Basin is now closed to new surface water appropriations, and that DNRC may not process or grant an application for such an appropriation. There is an exception to the closure for ground water. Section 85-2-341(2)(a), MCA. Ground water, as noted by the Court's Opinion, ¶ 33, and the dissent, ¶ 4, is not merely water that comes from under the ground. In order to be ground water within the statutory exception to the closure, the water extracted cannot be immediately or directly connected to surface water. Section 85-2-342(2), MCA. If it is so connected, it is simply not ground water, even though it may be pumped up from a well. It is surface water, and the application for its appropriation may neither be processed nor granted.

---

[1] As the statutes use two words, "ground water," I have chosen this form, rather than "groundwater" as used in the Court's Opinion and in the dissent.

¶61 The dissent is obviously correct that DNRC must, by the very nature of things, process every application for a new appropriation that claims it is for ground water. This processing has to be done to determine if the proposed appropriation is truly for ground water or whether the water proposed to be captured under the ground is actually connected to surface water, either immediately or directly. Some processing by DNRC is obviously required in order to make this initial determination, no matter what Trout Unlimited and the other plaintiffs may claim. If this were not true, the exception would be meaningless because without some initial processing there would be no way to determine if an applicant's proposal really would capture ground water. The Court does not seem to disagree with this obvious truth, but does not say so directly.

¶62 The dissent says that the Court's decision is overly broad and the futility doctrine should not be applied in this case. ¶ 12. With this, I must disagree. I agree with the Court that the record before us indicates that DNRC is wrong in how it has decided to determine whether water that comes up from the ground is immediately or directly connected to surface water. This is because, as noted by the Court at ¶ 37, DNRC, in its formal rules, does not account for impact to surface flow caused by prestream capture of tributary ground water. And, as DNRC can be expected to apply its erroneous rules during administrative proceedings, it would be futile to send the matter back for further DNRC processing without correcting the error. Correcting the error is all that I believe we do.

¶63 In my view, upon remand, the District Court will examine the complete record concerning the application in question, in the context of this Court's correction of DNRC

28

rules and policy, the Administrative Procedure Act, and the law. Then, the District Court will either remand to DNRC for further hearings or decide the matter itself.

¶64   I concur in the Court's decision to remand for further proceedings.


                                                          /S/ JOHN WARNER