JUSTICE MORRIS
dissents.
¶35 The Court minimizes the potential for irreparable harm to befall upon Benefis and the community of Great Falls in the event that the Clinic succeeds in skimming higher revenue, and better insured patients from the general community hospital. The fact that doctor owned specialty hospitals siphon more lucrative cases from general community hospitals and thereby potentially imperil the ability of general community hospitals to provide their safety net of charitable services, services to the poor, and other services that do not pay their own way raises the specter of irreparable harm that we should not ignore. See Medicare Payment Advisory Commission, Report to Congress: Physician-Owned Specialty Hospitals, <http://medpac.gov/publications/congressional_reports/Mar05_Spec Hospitals.pdf> (March 2005). The Legislature took note of this concern in 2005 when it enacted the Montana specialty hospital moratorium. See § 50-5-245, MCA.
¶36 These concerns highlight the need to assess these issues carefully without the imposition of a deadline artificially imposed by the Clinic as it races to consummate its merger. DPHHS allowed the Clinic to circumvent public scrutiny, however, when it disregarded the mandate of Article II, Section 8, of the Montana Constitution, by not holding any public hearings on the matter. DPHHS’s claims that its decision to license the Clinic constituted a nondiscretionary ministerial act ring hollow in light of the fact that DPHHS implemented a new hospital license application form to accommodate the Clinic’s new application. The Court acknowledges that the District Court “inappropriately resolved an ultimate issue” when it deemed DPHHS’s decision to license the Clinic to be a “ministerial act.” ¶ 28. The Court does not tamper with the District Court’s order, however, in light of the “fact-intensive” inquiry as to whether a matter constitutes an issue of “significant public interest.” ¶ 29.
¶37 The Court repeatedly has emphasized that Article II, Section 8 “guarantees citizens the right of participation in the operation of government agencies prior to the making of a final decision.” Jones v. County of Missoula, 2006 MT 2, ¶ 14, 330 Mont. 205, ¶ 14, 127 P.3d 406, ¶ 14. As the Court noted in Jones, “Section 2-3-103(1), MCA, *99 requires each public agency to adopt policies that permit and encourage public participation in agency decisions and also to assure adequate notice is given before a final agency action of significant public interest is taken.” Jones, ¶ 14. The statute itself mandates public participation in agency decisions regarding matters that “are of significant interest to the public.” Section 2-3-103(l)(a), MCA. The Court in Jones adopted the Attorney General’s definition of the term “significant public interest” as “ ‘any non-ministerial decision or action of a county commission which has meaning to or affects a portion of the community.’ ” Jones, ¶ 16 (quoting 47 Mont. Op. No. 13 Atty. Gen. at 6).
¶38 The District Court conceded that DPHHS’s issuance of a hospital license to the Clinic “may have been of particular interest to the parties.” The District Court remarkably concluded, however, that such interest did not necessarily translate into constituting a matter of “significant interest to the public at large.” As discussed in Jones, the term “significant public interest” encompasses those non-ministerial decisions or actions taken by a public agency that “has meaning to or affects a portion of the community.” Jones, ¶ 16 (emphasis added). DPHHS’s decision to issue a license to the Clinic would qualify as a matter of significant public interest under this criterion. Those portions of the community having to rely on Medicare, Medicaid, or other forms of public assistance in paying for their health care, accepted only at general community hospitals, likely would find DPHHS’s decision to license the Clinic to be a matter of significant public interest.
¶39 The District Court circumvented this problem by deeming DPHHS’s decision to license the Clinic as a non-discretionary ministerial act and therefore exempt from the public participation requirements by § 2-3-112(3), MCA. In reaching this conclusion, the court seemed to rely on the fact that DPHHS’s decision to issue the license was not “legislative” in nature. A ministerial act is “one performed pursuant to legal authority, and requiring no exercise of judgment.” Jones, ¶ 16.
¶40 Section 50-5-245, MCA, provides DPHHS with the legal authority to issue a new license to the Clinic. The statute refers to the federal law set forth at 42 U.S.C. § 1395nn for the definition of a “specialty hospital.” Section 50-5-245(2), MCA. The federal law, in turn, defines a “specialty hospital” as one “primarily or exclusively’ engaged in the care and treatment of certain specialized categories of services. 42 U.S.C. § 1395nn. Thus, as a threshold matter, it appears that DPHHS had to determine whether the Clinic would operate as a specialty *100 hospital in evaluating its license application. DPHHS had not adopted any regulations at that time, however, by which it could evaluate whether the Clinic would operate as a specialty hospital. Instead DPHHS had to proceed on ad hoc basis. In fact, DPHHS possessed no hospital license application form that could be used by the Clinic. DPHHS had to modify its existing hospital license application form to account for the Legislature’s specialty hospital moratorium.
¶41 DPHHS never bothered to subject this revised license application form to rulemaking requirements of the Montana Administrative Procedure Act, §§ 2-4-101 through -410, MCA. We faulted the Department of Natural Resources and Conservation for failing to “codify a rule outlining when groundwater is ‘immediately or directly connected to surface water’ through MAPA rulemaking process.” Montana Trout Unlimited v. Montana DNRC, 2006 MT 72, ¶ 26, 331 Mont. 483, ¶ 26, 133 P.3d 224, ¶ 26. We specifically rejected DNRC’s attempts to avoid formal rulemaking through a letter issued by its director. Trout Unlimited, ¶ 27.
¶42 DPHHS’s actions here are equally unjustified. DPHHS altered its existing hospital license application form to accommodate the Clinic’s application. DPHHS has yet to adopt detailed rules and regulations implementing § 50-5-245, MCA. For instance, DPHHS has not yet adopted rules and regulations to define the term “primarily” as used in the moratorium to define those hospitals engaged in the care and treatment of certain specialized categories of service. This failure to define “primarily” forced DPHHS to proceed with the Clinic’s application on an ad hoc basis. DPHHS could not state definitively whether a hospital doing 98 percent surgery “should be requesting a specialty hospital application.” Kemp nevertheless testified that, in his view, hospitals performing 85 percent surgery or 76 percent surgery should be classified as specialty hospitals. DPHHS has no idea what percent of the Clinic’s work will be surgery as DPHHS’s application never required the Clinic to disclose such information. DPHHS’s modified application simply allowed the applicant, in this case the Clinic, to claim that it would be a general hospital. The Clinic made this claim despite testimony from Dr. Zismer that the Clinic had no “definitive plan now” to make the transition from a specialty hospital to a general hospital.
¶43 I would reverse the order of the District Court and grant Benefis’s motion for a preliminary injunction to preserve the status quo pending the resolution of Benefis’s action for a declaratory judgment. We have defined the status quo as “the last actual, peaceable, noncontested condition which preceded the pending controversy.” Sweet Grass *101 Farms, Ltd. v. Board of County Commrs., 2000 MT 147, ¶ 28, 300 Mont. 66, ¶ 28, 2 P.3d 825, ¶ 28. This controversy started on January 31, 2006, when Benefis filed its action. Benefis filed its action before the Clinic rushed to consummate its transaction to “acquire the Central Montana Surgical Hospital in partnership with Essentia Health,” and before DPHHS had issued a new license to the Clinic. I respectfully dissent from the Court’s failure to restore the status quo.
JUSTICES NELSON and LEAPHART join in the foregoing dissent.