2007 VT 60

# Bennington Housing Authority v. Diane Bush and Scott Heaton

[933 A.2d 207]

No. 06-094

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed July 20, 2007

*James J. Cormier, Jr.* of *Cormier and Cormier*, Bennington, for Plaintiff-Appellee.

*R. Drew Palcsik, Vermont Legal Aid, Inc.*, Rutland, for Defendants-Appellants.

¶ 1. **Skoglund, J.** The Bennington Housing Authority (BHA) brought an eviction action against appellants, Diane Bush and Scott Heaton, on the ground that they withheld information from their lease application which, if known, would have disqualified them as eligible lessees. Ms. Bush and Mr. Heaton appeal the trial court's determination that they committed fraud in the inducement and that BHA appropriately exercised its discretion in evicting the family when, five years after admitting the family, it discovered material inaccuracies in their application concerning one family member. We reverse.

¶ 2. In April of 2000, Ms. Bush, her daughter, and Mr. Heaton were homeless, and Ms. Bush was pregnant with triplets. Ms. Bush filled out an application for public housing, listing herself as head of household. She provided information on her income, vehicles, previous landlord, and personal references. In a section

entitled "other required information" the application asked two questions about criminal history which Ms. Bush answered in the negative. The answers were truthful as to Ms. Bush. She testified that she did not think Mr. Heaton's criminal history was required on the form. She also testified that she asked Mr. Heaton to sign the section of the form that authorized the housing authority to do a record check on them both. BHA ran a background check on the couple which revealed no criminal history in Vermont. BHA admitted the family to the subsidized housing unit, and the family has lived there since May of 2000. Although there have been one or two termination notices, all complaints have been satisfactorily resolved. The director of BHA testified that the family had been tenants in good standing at all times relevant to the appeal.

¶ 3. Each year, public-housing tenants are required to affirm in writing that they do not exceed the income caps for subsidized housing, and that all the answers they gave on the application are true and correct. In 2003, BHA upgraded its background checking software, and in 2005, BHA ran a new check on Ms. Bush and Mr. Heaton. The search revealed that Mr. Heaton had a 1992 conviction for sale of a controlled substance and a 1994 conviction for burglary, both in New York State.

¶ 4. On March 16, 2005, BHA sent Ms. Bush and Mr. Heaton a notice of termination of their tenancy in accordance with the provision of the lease which states "[m]anagement shall not terminate or refuse to renew this lease other than for serious and repeated violations of material terms of the lease such as failure . . . to fulfill the tenant obligations as set forth herein, or for other good cause." The letter claimed that the tenants gave false information on their application, referencing Mr. Heaton's criminal record in New York. Thus, BHA sought to terminate the lease due to misrepresentation on the application filed in 2000.

¶ 5. After receiving the eviction letter, Ms. Bush and Mr. Heaton participated in an informal conference with Deborah Reed, BHA's executive director. According to the testimony of the executive director, Ms. Bush admitted she was aware Mr. Heaton had a criminal record but claimed she did not know the specifics such as whether he had been convicted of a felony. During that meeting, Mr. Heaton offered to move out if Ms. Reed would allow the rest of the family to stay, but she refused. Ms. Reed testified at trial that she did not consider any course of action other than evicting the entire family. She further testified that she knew she

had the authority to evict them and the discretion to choose not to do so based on materials she received from the U.S. Department of Housing and Urban Development (HUD).

¶ 6. The trial court concluded that Ms. Reed had not abused her discretion in deciding to evict the entire family. Further, the court found by clear and convincing evidence that Ms. Bush had fraudulently misrepresented the family's position on the application. For these reasons the trial court affirmed Ms. Reed's decision.

¶ 7. We review the trial court's findings concerning BHA's abuse of discretion for clear error. *N.A.S. Holdings, Inc. v. Pafundi*, 169 Vt. 437, 438, 736 A.2d 780, 783 (1999). Our review of its conclusions of law is nondeferential and plenary. *Id.* at 438-39, 736 A.2d at 783. In reviewing a trial court's conclusion that fraud in the inducement was proven by clear and convincing evidence, " '[t]he test . . . is not whether this Court is persuaded that there was clear and convincing evidence, but whether the factfinder could reasonably have concluded that the required factual predicate was highly probable.' " *In re E.T.*, 2004 VT 111, ¶ 13, 177 Vt. 405, 865 A.2d 416 (quoting *In re N.H.*, 168 Vt. 508, 512-13, 724 A.2d 467, 470 (1998)). Where the record indicates that the trial court clearly erred in finding clear and convincing evidence, this Court will reverse such a finding. *N.H.*, 168 Vt. at 514, 724 A.2d at 471.

¶ 8. We turn our attention first to the trial court's finding that Ms. Bush and Mr. Heaton committed fraud in the inducement. Although BHA made a general allegation of fraud in its complaint, it has not met its burden of proof. To succeed on this claim, BHA must prove the elements of fraud by clear and convincing evidence. *Gavala v. Claassen*, 2003 VT 16, ¶ 5, 175 Vt. 487, 819 A.2d 760 (mem.) (in all cases where fraud is alleged, it must be proved by clear and convincing evidence).

> An action for fraud and deceit will lie upon an intentional misrepresentation of existing fact, affecting the essence of the transaction, so long as the misrepresentation was false when made and known to be false by the maker, was not open to the defrauded party's knowledge, and was relied on by the defrauded party to his damage.

*Union Bank v. Jones*, 138 Vt. 115, 121, 411 A.2d 1338, 1342 (1980); see also *Powell v. D.C. Housing Auth.*, 818 A.2d 188, 196-97 (D.C. 2003) (outlining the elements of common law fraud in the context of a termination of public housing subsidy payments for under-reporting income).

■ ■ ¶ 9. Relying on its finding that both Ms. Bush and Mr. Heaton knew that they were required to reveal a felony conviction or involvement with drugs on the application form, and further relying on the finding that both applicants knowingly failed to do so, the court found the misrepresentations were false when made, that they were known to be false by the makers and were meant to be relied upon by the injured party. The evidence does not support these findings or the conclusion. "To find that a misstatement was made with knowledge of its falsity, the person accused, and not a hypothetical reasonable person, must be found to have known that the statement was false, or to have made that statement with reckless indifference as to its truth." *Powell*, 818 A.2d at 197-98 (citation and quotation omitted). Here, there was no evidence of any intent to deceive by Ms. Bush. The only evidence adduced indicated that Ms. Bush knew Mr. Heaton had participated in some criminal activity in the past. The housing application, however, asks only about the criminal history of the head of household in a section called "other required information." Question number seven in that section asks, "have *you* ever been charged with a felony? Yes___ No___" Question number eight asks "are *you* currently using illegal drugs? Yes___ No___" Question number nine asks "have *you* ever been charged with the sale, distribution or possession of illegal drugs? Yes___ No___" (Emphasis added.) The form contains other sections that allow space for different information to be supplied for each family member, but the "other required information" section does not. The only evidence adduced on this point was Ms. Bush's testimony that, at the time she filled out the housing application, she did not know that Mr. Heaton had committed a felony or that he had been involved in drugs. She knew only that he "had a past" and had been incarcerated at some time before they met.

■ ¶ 10. In addition, Ms. Bush testified that she knew the housing authority would conduct a criminal record check when she submitted the application. Mr. Heaton signed the authorization for a criminal record check as well. This is not evidence of intent to

defraud. The BHA testified that it investigated the information supplied on the application and found no information connecting either party to drug use or felony charges in Vermont, and accordingly, the application was accepted. Ms. Bush could reasonably rely on the housing authority to pick up any criminal activity which would be troublesome to it. However, the trial court found that misrepresentations were made not once, but repeated in subsequent applications, and the court concluded that "[t]o maintain that the failures to disclose were not made with fraudulent intent would fly in the face of the evidence and common sense." We disagree. No evidence was presented to indicate that Ms. Bush's knowledge of Mr. Heaton's record changed in the years that Mr. Heaton and Ms. Bush signed the five additional certifications. There was no reason for the tenants to believe, having already authorized a record check prior to being admitted to the housing project, that Mr. Heaton's past criminal record would disqualify them from housing. Thus, evidence of misrepresentation is scant at best, and evidence that the information given was "known to be false," *Union Bank*, 138 Vt. at 121, 411 A.2d at 1342, is even harder to come by.

¶ 11. Moreover, BHA did not show that the information was not "open to the defrauded party's knowledge" or that the information was "relied on by the defrauded party to his damage." *Id.* There was no evidence in the record that either Mr. Heaton or Ms. Bush knew the limitations of the BHA system when they applied for housing. And BHA did not rely on the information provided by Ms. Bush — it did indeed conduct its own criminal record check. The fact that BHA did not run a more extensive check does not tend to prove an intent to defraud on Ms. Bush or Mr. Heaton's part. Finally, BHA has not made any claim of damage. For these reasons, it was error for the trial court to find that fraud had occurred.

¶ 12. Next, we must examine the trial court's formulation of the standard of review. The trial court's order states, "[a]buse of discretion, as the term is currently applie[d], appears to mean that another reasonable person acting under the same circumstance would have resorted to another course of action." The trial court's articulation of the abuse-of-discretion standard is in error, and for this reason, as well, we must reverse. When reviewing for abuse of discretion, we must determine whether the court, and

BHA, "failed to exercise . . . discretion altogether or exercised it for reasons that are clearly untenable or unreasonable." *Herald Ass'n v. Dean*, 174 Vt. 350, 360, 816 A.2d 469, 478 (2002). In other words, an entity, vested with discretion, abuses that discretion when it behaves as if it has no other choice than the one it has taken, or when it makes a decision for which there is not adequate support.

¶ 13. The regulations clearly vest public housing authorities with discretion in dealing with violations of lease terms or regulations. 24 C.F.R. § 966.4(l)(2) (2006). BHA certainly may evict an entire family for the misdeeds of one member, but it need not do so. *Dep't of Housing & Urban Dev. v. Rucker*, 535 U.S. 125, 128-29 (2002). Furthermore, it should not do so without considering all of the available options. See *id.* at 133-34.[1] Here, BHA, acting through its executive director, apparently believed that evicting the entire family was its only choice. Ms. Reed testified that she never considered any other course of action, even when Mr. Heaton offered to leave. She stated that BHA would not have

---

[1] The regulations set out numerous circumstances in which the housing authority "may" terminate a lease, but only a very few circumstances in which it "must" terminate a lease. See, e.g., 24 C.F.R. § 966.4(l)(2) ("The PHA may terminate the tenancy only for: . . . (iii) Other good cause includ[ing], but . . . not limited to, the following: . . . (B) Discovery after admission of facts that made the tenant ineligible."); *id.* § 966.4(l)(5)(i)(B) ("In addition, the lease must provide that a PHA may evict a family when the PHA determines that a household member is illegally using a drug . . . ."). But see *id.* § 966.4(l)(5)(i)(A) ("The PHA must immediately terminate the tenancy if the PHA determines that any member of the household has ever been convicted of drug-related criminal activity for manufacture or production of methamphetamine on the premises of federally assisted housing.").

In addition, the regulations list certain things the housing authority may consider when deciding how to act.

>      (B) . . . [T]he PHA may consider all circumstances relevant to a particular case such as the seriousness of the offending action, the extent of participation by the leaseholder in the offending action, the effects that the eviction would have on family members not involved in the offending activity and the extent to which the leaseholder has shown personal responsibility and has taken all reasonable steps to prevent or mitigate the offending action.

>      (C) . . . The PHA may require a tenant to exclude a household member in order to continue to reside in the assisted unit, where that household member has participated in or been culpable for action or failure to act that warrants termination.

*Id.* § 966.4(l)(5)(vii)(B), (C).

admitted the family in the first place if it had known of Mr. Heaton's criminal record. As we noted above, however, the regulations are not so black and white. BHA certainly is not required to admit anyone who has a history of criminal activity, and such a history will be considered in evaluating an application. 24 C.F.R. §§ 960.202(a)(2)(iii), 960.203(c)(3). However, the regulations permit BHA to overlook drug history if the person is no longer engaging in drug abuse or has been rehabilitated. *Id.* § 960.204(a)(1). Thus, although Ms. Reed testified that BHA would not have accepted the application originally if it had included Mr. Heaton's convictions, such testimony is somewhat speculative and self-serving based on the regulations as they are written.

¶ 14. The abuse of discretion in this case arose when BHA applied what it claims was a black and white eligibility rule five years after the original eligibility determination. First, as explained above, the rules are not inflexible. BHA could have admitted the family despite Mr. Heaton's criminal history. 24 C.F.R. § 960.204(a)(1)(i). Second, the import of the regulations is to protect public housing from criminal elements, especially drug activity, that could adversely affect the community. The underlying community protection goals are not met by removing a family that has not been engaged in criminal activity during the five years of their tenancy. Third, federal advisory information counsels against the application of rigid rules in public housing because of the hardship that arises when tenants lose their housing. Thus, any reasonable approach to this problem should have included a balancing in this particular case of the current situation and tenant history against a failure to include information in the original application. In the end, it is still BHA's decision, but the decision must not be made arbitrarily or without an apparent consideration of the alternatives laid out in the regulations. See, e.g., 24 C.F.R. § 966.4(l)(5)(vii)(C). In affirming BHA's decision under an erroneous abuse-of-discretion standard, without examination, the trial court erred.

¶ 15. The Court recognizes that there are significant policy reasons for applying public housing restrictions stringently. It is important to keep subsidized housing as free as possible from the very real danger posed by crime. Furthermore, as BHA notes, the waiting list to get into public housing is long. For these reasons, it may have been appropriate to require Mr. Heaton to leave. Although the record indicates that he has not been involved in any

criminal activity for more than a decade, the regulations clearly state that the housing authority has the discretion to evict persons who are ineligible for public housing. 24 C.F.R. § 966.4(l)(2)(iii)(B), (C). It is not for this Court to evaluate the wisdom or effectiveness of such regulations in the context of rehabilitating offenders. However, as discussed above, BHA failed to exercise its discretion in evaluating this apparently rehabilitated tenant.

¶ 16. Furthermore, this decision should not be read to bar a housing authority from evicting a family if the head of household had *intentionally* misrepresented the criminal history of any family member on an application. As BHA notes, there are many honest families in equally dire situations who do not resort to fraud to obtain housing. The facts in this case simply do not meet the necessary standards of proof, and for this reason, it was an abuse of discretion to evict this family.

*The trial court's decision is reversed.*

¶ 17. **Burgess, J.,** dissenting. I dissent from the majority's reasoning and its decision to allow tenants to retain their leasehold despite material false statements on their application for public housing. Tenants failed to disclose that Mr. Heaton was a felon and a convicted drug offender. The application and lease explicitly warned that such misrepresentations were good cause for termination of their lease. The trial court's conclusion that tenants knowingly submitted the false information to deceive BHA was not clearly erroneous, was amply supported by the evidence, and should be upheld. BHA's "zero tolerance" policy for falsified applications is not an abuse of discretion. Nor was it an abuse of discretion to evict tenants in response to their knowing falsehood so as to discourage the same dishonesty by others. Accordingly, I would affirm the trial court's judgment.

¶ 18. So anxious appears the majority to take over the reins of BHA to change the result in this unfortunate situation that it abandons the presumption ·of reasonableness and validity usually accorded agency decisions reached within the agency's expertise. *In re Capital Inv., Inc.*, 150 Vt. 478, 480, 554 A.2d 662, 665 (1988). Ordinarily we require a clear and convincing showing to overcome that presumption, and do not overturn an agency's decision if there is any reasonable basis to support its actions. *Id.* There is no such showing here. That the majority might have responded differently does not mean that BHA, or the trial court, abused its

discretion in reaching an opposite result. See, e.g., *In re L.R.R.*, 143 Vt. 560, 562, 469 A.2d 1173, 1175 (1983) (discretionary ruling will not be set aside "simply because a different result might have been supportable, or because another court might have reached a different conclusion").

¶ 19. It was no abuse of discretion for BHA to do what the parties agree it was plainly authorized by law to do. It is senseless, and not for the Court, to make BHA balance the merits between evicting tenants who falsify their housing application and allowing them to stay for the sake of their children, when either result is entirely within the agency's discretion. It is no less strange for the majority to impose judicial review over BHA's discretionary decisions when whatever decision it reaches within its discretion — to evict or not to evict for fraud — is authorized by law. The issue is not, as the majority posits, that tenants have been well-behaved since moving in, but whether BHA can evict them for lying about felonies and drug offenses on their housing application. The regulations make clear that screening applicants is crucial "to public housing communities and program integrity, and the demand for assisted housing by families who will adhere to lease responsibilities." 24 C.F.R. § 960.203(b) (2006). Requiring applicants to be truthful on their housing applications serves these goals, and those who are not truthful may clearly be expelled. *Id.* § 966.4(l)(2)(iii)(B), (C) (stating that "good cause" for eviction includes a housing authority's discovery of tenant ineligibility, or discovery of a material false statement in a tenant's application). Just as clearly, BHA may, like any landlord, choose to allow dishonest applicants to stay. Examination by the courts of such determinations is not judicial review, but is just second-guessing.

¶ 20. The record reflects that on their housing application tenants represented that neither had been charged with a felony nor charged with the sale, distribution, or possession of illegal drugs.[2] They certified that:

---

[2] The record does not show, as the majority suggests, that Ms. Bush understood these questions to apply only to her as "head of household." See *ante*, ¶ 9. In fact, Ms. Bush testified to exactly the opposite effect, acknowledging she needed to get Mr. Heaton's signature on the application and explaining that she filled out the form truthfully "as far as [she] knew" at that time, because "*we* (referring to herself *and* Mr. Heaton) had discussed a past; we never got into felonies or anything like that. We had discussed his past." Clearly Ms. Bush knew she answered the questionnaire on behalf of Mr. Heaton, coincidentally identified as

> ALL INFORMATION IN THE APPLICATION IS TRUE TO THE BEST OF MY/OUR KNOWLEDGE AND I/WE UNDERSTAND THAT FALSE STATE-MENTS OR OTHER INFORMATION . . . WILL LEAD TO CANCELLATION OF THE APPLICATION OR TERMINATION OF TENANCY AFTER OCCUPANCY.

One month later, tenants signed a lease agreement with BHA which provided that BHA could terminate or refuse to renew the lease for good cause, and specified, under the heading of "Mis-representation," that:

> In the event tenant misrepresents facts or information to management during the application, investigation, and tenant selection period prior to the execution of this lease or subsequent thereto, said misrepresentation(s) shall constitute good cause for termination of this lease.

BHA's check for a criminal record in Vermont turned up nothing. Later, an updated record check in New York revealed that, contrary to the representations on the application, Mr. Heaton had two felony convictions in New York State, one for attempted burglary and one for sale of a controlled substance.

¶ 21. The executive director of BHA issued a termination notice to the tenants, explaining that their lease would be terminated for "misrepresentation" and "knowingly supplying false, incomplete, or inaccurate information" about Mr. Heaton's criminal record on their application. Before termination and in accordance with the process due under the lease and the housing regulations, the executive director conferred with the tenants to afford them an opportunity to respond to the notice. At the conference, according to the executive director's testimony, Mr. Heaton responded that he did not have any convictions *in Vermont*, and Ms. Bush claimed she did not know any specifics of Mr. Heaton's criminal record. In a post-conference letter confirming the director's decision to terminate, tenants were advised of their right to a pretermination

---

"co-applicant" on the form, as well as for herself. Not claiming she answered only for herself, Ms. Bush instead claimed ignorance of the "specifics" of Mr. Heaton's record, including the felony and drug offenses — although she was aware he had a "past" that involved a six-year jail stint.

hearing, which they declined, and the subsequent eviction action alleging fraud[3] was filed and proceeded to trial.

¶ 22. The majority attacks the trial court's decision on two fronts: for failing to comport with the majority's notion of merit, and for failing to share the majority's misconception of the discretion owed the tenants by BHA. The majority declares the judgment in favor of BHA on eviction for fraud unsupported by the evidence, while ignoring the trial court's determination of credibility, and without applying any discernible standard of review. Next, the trial court is faulted for reversible error in "affirming . . . without examination" BHA's decision to terminate the lease, *ante*, ¶ 14, despite the court's examination of BHA's action in view of the housing authority's rights and obligations to the tenants under the lease and the discretion claimed due by the tenants.

¶ 23. Starting with the judgment of eviction for fraud, the trial court's decision was well-supported within our established standard of review. BHA's burden was to prove the fraud by clear and convincing evidence, but

> [d]espite the heightened burden of proof . . . , the standard of review in this context remains deferential: The test on review is not whether this Court is persuaded that there was clear and convincing evidence, but whether the factfinder could reasonably have concluded that the required factual predicate was highly probable. Only where the record indicates that the trial court clearly erred in finding clear and convincing evidence will this Court reverse such a finding.

*In re E.T.*, 2004 VT 111, ¶ 13, 177 Vt. 405, 865 A.2d 416 (citations omitted and emphasis added).

¶ 24. The trial court's conclusion that tenants defrauded BHA by knowingly submitting false information on their housing application was not clearly erroneous. Mr. Heaton admitted the convictions after their discovery by BHA. As to Ms. Bush, the trial

---

[3] Although the terms of the application and lease, and the regulation at 24 C.F.R. § 966.4(l)(2)(B), (C), provide for eviction on the submission of false material information alone, regardless of the applicant's knowledge or fraudulent intent, BHA nevertheless claimed fraud in its complaint and tenants insisted that the trial court treat it as an action for common-law fraud. The case will be addressed as pleaded.

court found that she knew her misrepresentation — that Mr. Heaton had no felony or drug convictions — was false when she filled out the application. While not stated by the court, this necessarily and obviously means that the trial court found Ms. Bush incredible in her assertion of ignorance that her partner's criminal record included felonies and drug offenses. "As the trier of fact, it was the province of the trial court to determine the credibility of the witnesses and weigh the persuasiveness of the evidence." *Cabot v. Cabot*, 166 Vt. 485, 497, 697 A.2d 644, 652 (1997).

¶ 25. This was strictly a swearing contest. On the one hand, Ms. Bush testified that, while knowing Mr. Heaton had a criminal past and spent six years in prison, and sharing her household and the company of her thirteen-year-old daughter with him, she did not know and did not want to know about Mr. Heaton's record. Ms. Bush also testified that she was not inclined to disclose her partner's "past" to BHA, because "they were doing a background check on us anyway so I figured whatever they were going to find out, they were going to find out." At a minimum, then, the court knew that Ms. Bush was simply taking her chances that the background check would not reveal a felony or drug conviction. This lack of forthrightness, combined with the not-altogether-likely proposition that Ms. Bush lived with and exposed her daughter to a six-year-imprisoned criminal without being curious about the nature of the man's record, would not appear to compel a reasonable finder of fact to assume Ms. Bush was telling the truth. On the other hand, as noted by the trial court, the tenants were made desperate by their homelessness and the impending birth of triplets, and knew that disclosing a felony or drug record would disqualify them from BHA housing.

¶ 26. The trial court did not believe Ms. Bush and need not explain its disbelief. *State v. Hagen*, 151 Vt. 64, 65, 557 A.2d 493, 494 (1989) (finding "no support in Vermont law" for argument that the trial court's conclusion that a witness was incredible must be accompanied by "some finding showing the reasoning of the court in rejecting the testimony, or some other support in the record"). "It is axiomatic in this state that the trier of fact is given the sole determination of the . . . credibility of witnesses, and the persuasive effect of the testimony." *Id.* (explaining that this Court does not ordinarily review credibility determinations "[g]iven the inherent difficulty in evaluating demeanor, mannerisms, and tone

of voice, in addition to the quality of testimony itself," and that this Court has never applied an evidentiary test for the finding of witness credibility since such determination turns on intangibles and the "judge's discretion and experience and is rarely reducible to a precise formula").[4]

¶ 27. The trial court's conclusion — that to argue Ms. Bush's "failures to disclose were not made with fraudulent intent would fly in the face of the evidence and common sense" — was supported by the evidence. Having concluded that Ms. Bush knowingly falsified her application, the court then knew that her misrepresentation was false and known to be false when made. The court also knew that the misrepresentation was made in response to a question about felony and drug convictions prominently included on the application. Further, the court's finding that Ms. Bush was desperate for BHA housing was entirely supported by the evidence. Given her desperation and that she deliberately gave a false answer to a prominent question, the trial court could reasonably conclude, as it did, that it was highly probable that Ms. Bush meant the falsehood to be relied upon by the housing authority. The executive director testified, and the trial court found, that had Ms. Bush answered honestly about Mr. Heaton's felony and drug convictions, their application would have been turned down. Thus it was highly probable, if not certain, that the misrepresentation was relied upon by BHA. It cannot be said that the trial court was clearly erroneous in its conclusion that BHA proved the fraud underlying its eviction.

¶ 28. The majority is further mistaken in its conclusion that the trial court was without evidence of damage when it was undis-

---

[4] The majority's review and evaluation of Ms. Bush's testimony is directly at odds with our long-established precedent not to second-guess trial court credibility determinations. Our function is "not to reweigh evidence or to make finding of credibility de novo." *Mullin v. Phelps*, 162 Vt. 250, 261, 647 A.2d 714, 720 (1994). The reason for this is well-illustrated by the majority's conclusion that Ms. Bush's protestations of ignorance were not incredible based upon an interpretation of her testimony that she answered the questionnaire only for herself, and that it was illogical for her to falsify when she knew her answers would be checked by BHA. Both premises are wrong, for the record plainly indicates that, taking her testimony in context, Ms. Bush was indeed referring to her co-tenant's "past" when filling out the application, and that, already homeless with nothing to lose, she simply took her chances on the record check (a good gamble, as it turned out, since the check failed to reveal the disqualifying out-of-state felonies and drug convictions).

puted that tenants would not have been offered a lease but for their falsification of the housing application.[5] However intangible, BHA's damage was the loss of its right to make an informed decision based on a truthful application, and its right under the regulations to exclude burglars and drug dealers from its housing project. See 24 C.F.R. § 960.203(c)(3), (d) (authorizing housing authorities to exclude applicants with a history of criminal acts that "would adversely affect the health, safety or welfare of other tenants" considering the "time, nature, and . . . seriousness of the offense"). Analogizing, as we must, to damages for fraud in the context of this eviction action, the damage sought to be remedied was the return of the leasehold dishonestly obtained by these tenants. See *Larochelle v. Komery*, 128 Vt. 262, 268, 261 A.2d 29, 33 (1970) (observing that the purpose of damages in a tort action for fraud is to return the injured party to "the same position that he would have occupied had he not been defrauded"). The record evidence was quite sufficient for the trial court to reasonably conclude that it was highly probable that BHA was fooled into granting tenants a leasehold that it otherwise would not have conveyed.

¶ 29. Similarly, the majority is in error when it says that because BHA had the ability to discover the falsehood through criminal record checks there was no evidence that the misrepresentation "was not open to the defrauded party's knowledge" as necessary for common-law fraud. *Union Bank v. Jones*, 138 Vt. 115, 121, 411 A.2d 1338, 1342 (1980). The testimony was that BHA did not have the ability to computer-check records beyond Vermont until some time after the application, and that the director did not know of the record until she checked New York records in connection with an unrelated complaint. Assuming that BHA could have run a more exhaustive check at the time of application, it is long-settled that "when the essential elements of a fraudulent representation are established, it is no excuse for the defendant,

---

[5] The majority curiously assumes the mantle of the trial court to characterize the executive director's testimony in this regard as "somewhat speculative and self-serving." *Ante*, ¶ 13. Such assessments are properly left to the judge who hears the evidence and, as accepted by the trial judge, this testimony appeared to be neither uncertain nor convenient. The witness' statement was entirely consistent with the written BHA policies admitted into evidence in connection with her testimony, as well as with the governing federal regulations. Moreover, this aspect of her testimony was never challenged in any sense on cross-examination, and was found by the trial court as fact.

nor does it lie in [her] mouth to say, that the plaintiff might, but for his own neglect, have discovered the wrong and prevented its accomplishment." *Arnold v. Somers*, 92 Vt. 512, 520-21, 105 A. 260, 263 (1918). On this record the majority cannot seriously maintain that it was not highly probable that BHA was ignorant of Mr. Heaton's record when it was misrepresented on the application by Ms. Bush, or that the trial court was clearly erroneous in so concluding.

¶ 30. If, as the majority says, the trial court applied the wrong standard for abuse of discretion in its review of BHA's termination of the lease, it was harmless error. Even under the majority's definition, the reason given for BHA's policy to terminate its leases with tenants caught lying on their applications, rather than tolerate such dishonesty, was not so "untenable or unreasonable" as to be an abuse of discretion. *Herald Ass'n v. Dean*, 174 Vt. 350, 360, 816 A.2d 469, 478 (2002). The majority is simply incorrect when it says that BHA "applied what it claims was a black and white eligibility rule five years after the original eligibility determination." *Ante*, ¶ 14. BHA made no such claim. As the executive director testified, the notice to the tenants stated, and the trial court found, BHA based its action not on ineligibility as of the time tenants applied for housing, but on a firm policy of lease termination if tenants falsified material information on their application.[6] BHA's rationale of zero tolerance for application falsification — to promote candid disclosure and to discourage dishonesty — may be strict, but it is no abuse of discretion.

¶ 31. Moreover, the policy described by BHA and found by the trial court is expressly approved in the federal housing regulation 24 C.F.R. § 966.4(l)(2)(iii)(B), (C), which specifically provides that "good cause" for termination includes "[d]iscovery after admission [to the project] of facts that made the tenant ineligible," and "[d]iscovery of material false statements . . . by the tenant in connection with an application." Having discovered tenants' material falsehood on the application, good cause for termination was established under the regulation and, once established, no regu-

---

[6] Asked if BHA could overlook misrepresentations on applications for admission to public housing, the executive director answered, "No, we can't because then other people that are coming in and other tenants in the complex say they got away with it, so we can do it, too." Later, on cross-examination, the director agreed she considered no other option but termination "because they weren't honest with me in the beginning."

lation obligated BHA to then balance mitigating circumstances against termination.

¶ 32. While agreeing that the regulations clearly vested BHA with discretion in dealing with violations, the majority then misconstrues the regulations to impose some obligation on BHA to consider all options short of evicting the entire family. It should be reiterated here what this case is, and is not, about. We are not called upon to rule on what discretion must, or need not be, exercised by BHA when confronted with criminal activities by some, but not all, members of a tenant household. The only issue before this Court is whether BHA can terminate the lease of tenants who falsify material information on their housing application. Here, BHA was committed to evicting the entire family, not just because the father lied on the application, but because the mother lied also.

¶ 33. Contrary to the majority's construction, the federal regulations do not require a public housing authority to engage in a balancing process before deciding to terminate a tenancy. The regulations provide that BHA may terminate a tenancy at any time in accordance with 24 C.F.R. § 966.4(l). 24 C.F.R. § 966.4(a)(2)(iii). Section 966.4(l) lists several "[g]rounds for termination of tenancy." *Id.* § 966.4(l)(1)-(2). Among them is "good cause," including the discovery of disqualifying facts or application falsehoods mentioned earlier. *Id.* § 966.4(l)(2)(iii)(B), (C). The regulations state that housing authorities "may" also consider mitigating circumstances in deciding to evict, see *id.* § 966.4(l)(5)(vii)(A)-(E), but these provisions apply only to evictions based on then-current criminal activity as described in preceding sections of the rule. See *id.* § 966.4(l)(5)(i) ("[e]victing drug criminals"), (ii) ("[e]victing other criminals"), (iii) ("[e]viction for criminal activity"). While the rules cited by the majority are inapposite to this case, it is nevertheless noteworthy that even the eviction-for-criminal-activity regulations do not *require*, but merely permit, a public housing authority to engage in a balancing process before terminating a lease. See *id.* § 966.4(a)(2)(iii); *id.* § 966.4(l)(5)(vii)(B). See also *Burton v. Tampa Housing Auth.*, 171 F. Supp. 2d 1314, 1317 (M.D. Fla. 2000) (holding that, although federal regulations "authorize public housing agencies to make eviction decisions on a case-by-case basis, they do not mandate such discretionary review"). As the *Burton* court noted, this conclusion is consistent with the general policy of the Public Housing Act, which is "to

give local public housing authorities the maximum amount of responsibility in the administration of their programs." *Id.*[7]

¶ 34. It appears that the majority stands for a proposition that an agency granted discretionary authority to deal with general situations is nevertheless prohibited from adopting and following a policy prescribing certain results within that broad discretion, because the policy is not mandated. Instead, the proposition continues, the agency must address each individual situation as it arises, lest it not use the breadth of its discretion each time, although the exercise of discretion is not mandated either. So, here the regulations say that falsification of a housing application is good cause for termination, but they do not mandate that result, while other regulations also authorize, but also do not mandate, that the housing authority "may" consider mitigation before evicting for criminal activity. Thus, the majority reasons, it is an abuse of its available discretion for BHA to refuse to consider mitigation instead of following its policy to evict for falsification based on the regulatory definition of good cause for termination.

¶ 35. There are several flaws in this logic. The first is that nowhere does it appears that tenants are entitled to the exercise of discretion they claim. It is certainly not in their lease, which says quite the opposite, and it is not in the regulations cited. No regulation requires BHA to consider or balance other circumstances as precondition to either termination or to allow a tenant

---

[7] *Department of Housing & Urban Development v. Rucker*, 535 U.S. 125 (2002), cited by the majority at *ante*, ¶ 13, says nothing to the contrary. *Rucker* does not hold that public housing authorities must exercise discretion to consider other options before terminating a public housing tenancy. Rather, in *Rucker*, the United States Supreme Court held that, under federal law, public housing lease agreements must include a clause that gives the housing authorities discretion to terminate a lease when a member or guest of the tenant's household engages in drug-related activity, regardless of the tenant's ignorance of that activity. The Court confirmed that eviction was not *required*, but that the law entrusted that decision to the local housing authorities. *Id.* at 133-34. The Court found nothing unreasonable, however, in allowing "no fault" eviction of a tenant on account of drug activities by a household member, finding such eviction to be "a common incident of tenant responsibility under normal landlord-tenant law and practice." *Id.* at 134 (citation omitted). As the Court explained "[s]trict liability maximizes deterrence and eases enforcement difficulties." *Id. Rucker* does not support the majority's analysis; it merely emphasizes the broad discretion afforded a public housing authority in administering its operations.

to stay. Second, the same lack of regulatory obligation undermines the majority's premise that BHA just simply must exercise more discretion, because the option to consider mitigation at all is itself purely discretionary. Under the regulations, BHA is entirely free to elect not to consider discretionary balancing. Third, reading the regulations to somehow mandate discretionary balancing nullifies the "good cause for termination" expressly recognized and spelled out in the plain language of the regulation. 24 C.F.R. § 966.4(l)(2)(iii)(B), (C).[8]

¶ 36. Finally, the whole issue of "abuse of discretion" by BHA appears to be improperly before this Court. Pleaded as an "affirmative defense" to the eviction action, tenants essentially challenged the underlying administrative action by BHA to terminate the lease under the regulations. BHA is a creature of the state, "or a political subdivision thereof," for purposes of review of governmental action under V.R.C.P. 75(a). See 24 V.S.A. §§ 4001-4008 (declaring formation of local housing authorities as "public bod[ies], corporate and politic, exercising public and essential governmental functions" necessary to fund, build and administer public housing). In many ways, tenants' claim of abuse of discretion resembles, and might have been framed as, a petition or counterclaim for review of governmental action, or for injunctive or declaratory relief. However pleaded, the matter was not for the trial court to decide because tenants failed even to initiate, let alone exhaust, their administrative remedies.

¶ 37. Before and after their informal conference with the director, tenants were notified of their right to a hearing under the BHA grievance procedure. The right to a fairly elaborate hearing process is established by the regulations, see 24 C.F.R. §§ 966.52-966.57, which include a provision that:

> At the hearing, the complainant must first make a showing of an entitlement to the relief sought and thereafter the [public housing authority] must sustain the burden of justifying the [authority's] action or failure to act against which the complaint is directed.

*Id.* § 966.56(e). Whether BHA was unreasonable in its administration or legally incorrect in its construction of the regulations was

---

[8] The majority's construction would convert "good cause for termination" into something less, like "almost good cause," "not quite good cause," or "good cause to start talking about termination." This is not what the regulation says.

properly subject to the grievance procedure. Tenants, however, did not pursue a grievance.[9] We have often held that "when an administrative remedy is established by statute or regulation, relief must not only be sought in accordance therewith, but must first be exhausted before recourse to the courts is available." *In re D.A. Assocs.*, 150 Vt. 18, 20, 547 A.2d 1325, 1326 (1988). The question of abuse of discretion by BHA should be treated as waived, for the encouragement of others, and not entertained here.

¶ 38. The trial court's decision should be affirmed. I am authorized to state that Justice Dooley joins in this dissent.

¶ 39. **Dooley, J.**, dissenting. I join the dissent in this case, but write separately to make three points about the context, the facts supporting the superior court's action, and the applicable law.

¶ 40. First, the context. The actions of BHA in this case reflect the enforcement of a national policy to protect the safety of tenants of public housing. The policy was announced by President William Clinton in his State of the Union Address in 1996, 1996 WL 23253 (Jan. 24, 1996), and in his remarks at a One Strike Crime Symposium later in that year, see 1996 WL 139526 (March 28, 1996). The policy was based on giving public housing tenants "a better deal than they have gotten in the past." *Id.* at *2.

> This policy today is a clear signal to drug dealers and to gangs: If you break the law, you no[ ] longer have a home in public housing. One strike and you're out. That should be the law everywhere in America.

> To implement this rule, we are taking two steps. First, I will direct Secretary Cisneros to issue guidelines to public housing and law enforcement officials to spell out with unmistakable clarity how to enforce one strike and you're out. These guidelines are essential.

> Believe it or not, the federal law has actually authorized one strike eviction since 1988. But many public housing authorities have not understood the scope of their legal authority. Others have problems working with

---

[9] Tenants acknowledged the existence of the grievance procedure in their proposed findings filed prior to trial. On appeal, tenants complained that notice of the grievance procedure was deficient, but this issue was never raised before the trial court and so was not preserved.

residents or local police or the courts. And for a small number, enforcement has, frankly, not been a priority. For whatever reason, the sad fact is that in most places in this country, one strike has not been carried out. . . .

Now there will be no more excuses, for those national guidelines tell public housing authorities the steps they must take to evict drug dealers and other criminals. They explain how housing authorities must work with tenants, with the police, with the courts [and] with our government to get the job d[one]. *They also tell housing authorities how to screen tenants for criminal records. With effective screening, many of the bad people we're trying hard to remove today won't get into public housing in the first place.*

The second thing we're going to do is to make sure these guidelines don't sit around and gather dust. Under the new rules HUD will propose, for the first time there will actually be penalties for housing projects that do not fight crime and enforce one strike and you're out.

*Id.* (emphasis added). HUD reiterated the national policy through a policy directive. See Directive 96-16, " 'One Strike and You're Out' Screening and Eviction Guidelines for Public Housing Authorities" (April 12, 1996), http://www.hudclips.org/ (follow "library" hyperlink; then select "Public and Indian Housing" under "Notices"; then enter 96-16 under "Document number").

¶ 41. BHA implemented the national policy directive, in part, by adopting a one strike, or zero tolerance, rule for applicants who lie on the housing application. This decision shows that BHA is caught in a conflict between implementing national policy on which its funding can be based and a majority of this Court which is obviously unsupportive of the national policy or its implementation.

¶ 42. Second, and despite the decision of the majority, this is not a close case on the facts. The application misrepresentations go to the heart of the policy on keeping public housing projects free of criminal conduct, particularly drug sales, and the evidence of the misrepresentations is overwhelming. This is not a case where tenants are being evicted for incidental and unimportant misrepresentations, or on weak evidence.

¶ 43. It is undisputed that Scott Heaton spent six years in prison in New York for felony offenses that involved burglary and selling drugs and also was found guilty of lesser criminal offenses in that state. Yet, he signed and certified a public housing application that said he had never been charged with a felony and had never been charged with the sale, distribution or possession of illegal drugs. As quoted above, the application form stated that tenants "CERTIF[IED] THAT ALL INFORMATION IN THE APPLICATION [WAS] TRUE TO THE BEST OF [THEIR] KNOWLEDGE" and that they "UNDERST[OOD] THAT FALSE STATEMENTS OR OTHER INFORMATION [WERE] PUNISHABLE BY LAW AND [WOULD] LEAD TO CANCELLATION OF THE APPLICATION OR TERMINATION OF [THE] TENANCY AFTER OCCUPANCY."

¶ 44. The case here was open-and-shut as to Mr. Heaton, but virtually without explanation of his circumstances, the majority reverses his eviction on the basis that there is no evidence of intent to misrepresent. Apparently, the majority accepts as a defense that Mr. Heaton signed without reading the application and, thus, is innocent of any misrepresentation, a result that simply eliminates any obligation to be truthful.

¶ 45. The situation is only marginally better with respect to Ms. Bush. Assuming what she knew about Mr. Heaton's circumstances is relevant, an assumption I do not accept given Mr. Heaton's misrepresentation, the majority holds that as a matter of law the trial court must accept her statement that she knew Mr. Heaton spent six years in jail, but did not know the grounds for the imprisonment or that he had been charged with a felony. Without expecting that Ms. Bush fully understands the technical distinction between felonies and misdemeanors, it could escape no one that a six-year sentence could be imposed only for serious crimes. I would join the trial judge in finding Ms. Bush's explanation not worthy of belief. Of course, my evaluation of the credibility of Ms. Bush is irrelevant, just as it should be also for the majority.

¶ 46. My characterization of the closeness of this case applies equally to the majority's conclusion that BHA did not rely on the information provided by the tenants as a matter of law. Based on the evidence from the director of BHA, the court specifically found that BHA would not have admitted the tenants if it had known of Mr. Heaton's New York criminal record, and that the only information BHA had concerning criminal convictions from

other states came from the tenants. Moreover, the court found that the application answers "were meant to be relied on by the injured party." Thus the majority's statement that "BHA did not rely on the information provided by Ms. Bush," *ante*, ¶ 11, is plainly contradicted by the evidence and the findings based on that evidence. The majority's final statement on this point — that the fact "that BHA did not run a more extensive check does not . . . prove an intent to defraud" — both understates the finding that BHA did not have the technological capacity to search criminal records beyond Vermont and confuses reliance with intent to defraud, a wholly different element.

¶ 47. Finally, the facts are presented as if BHA can evict only if both tenants personally participated in the misrepresentations, or at least if the "head of household" participated in the misrepresentation. I think the evidence is overwhelming that both tenants did, but I find nothing in the policies of BHA or the HUD rules on application or eviction that suggest that Ms. Bush's lack of knowledge is a defense when Mr. Heaton had the requisite knowledge and falsely certified the accuracy of his application with respect to his criminal history. The designation of "head of household" apparently reflects only that Ms. Bush was present to fill out the form, and no rule or guideline suggests that the representations of a co-applicant who will live in the unit are less important than those of the "head of household."

¶ 48. On a related point, nothing in the rules or policies suggest that BHA can evict only the person who made the misrepresentation, leaving the other family members in place. The fact that the tenants offered such a solution to settle the dispute does not mean there is any legal obligation for BHA to accept it. There are many practical reasons why BHA would not accept such a settlement, not the least of which would be the practical impossibility of keeping Mr. Heaton off the premises where his children and partner reside.

¶ 49. Third, I don't agree that a zero tolerance policy on some issues is inconsistent with HUD regulations and guidelines. Indeed, as the context demonstrates, such a policy represents the desired implementation of HUD guidelines if used carefully and sparingly. This issue is analyzed in Justice Burgess's dissent, which I join. I note also that HUD stated in its directive on this policy that "current law permits local housing agencies to adopt One Strike policies." HUD Directive 96-16 at 1. As discussed

above, the one-strike policy involves "Tougher Screening." *Id.* at 4. It also involves adoption of zero tolerance policies with respect to certain offenses. See, e.g., *id.* at 6 (stating that leases should express zero tolerance policy with respect to criminal activity).

¶ 50. In this case, BHA announced its zero tolerance policy through its application, which stated that "FALSE STATEMENTS [IN THE APPLICATION] . . . *WILL LEAD* TO CANCELLATION OF THE APPLICATION OR TERMINATION OF TENANCY AFTER OCCUPANCY." Misrepresentation by nondisclosure of criminal convictions and charges is an appropriate situation for a zero tolerance policy. It indicates an unwillingness to deal fairly and openly with the housing authority and restricts the ability of the housing authority to make appropriate eligibility determinations to protect existing tenants.

¶ 51. Even if I agreed that a zero tolerance policy was unlawful, I could not agree that BHA failed to exercise in this case exactly the discretion the majority seeks. In response to the question of whether BHA considered "the circumstances surrounding their tenancy," the BHA director answered that BHA had "some issues" with the tenants in the past and had served them with two termination notices and that there had been a domestic violence incident. Indeed, tenants' conduct led BHA to do a national record check on them when the capacity to do so became available.

¶ 52. The majority is essentially warring with BHA's adoption of a national policy to make public housing projects safe and secure for residents by screening out those with criminal backgrounds. Whatever our view of this national policy, it is our duty to enforce the law through which it has been implemented, rather than our policy preference. The majority fails to discharge that duty.