DA 06-0774

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 407

CLARK FORK COALITION, ROCK CREEK
ALLIANCE, INC., CABINET RESOURCE
GROUP, INC., MONTANA ENVIRONMENTAL
INFORMATION CENTER, INC., AND TROUT UNLIMITED,

      Plaintiffs and Appellants,

  v.

MONTANA DEPARTMENT OF ENVIRONMENTAL QUALITY,

      Defendant and Appellee.

APPEAL FROM:    District Court of the First Judicial District,
                In and For the County of Lewis And Clark, Cause No. BDV 2002-70
                Honorable Jeffrey M. Sherlock, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

           Jack R. Tuholske (argued), Attorney at Law, Missoula, Montana
           Matt Clifford (argued), Attorney at Law, Missoula, Montana
           David K. W. Wilson, Jr, Attorney at Law, Helena, Montana

      For Appellee:

           Claudia L. Massman (argued), Special Assistant Attorney General, Helena,
           Montana

                       Argued and Submitted:  November 7, 2007

                             Decided:  December 4, 2008

Filed:

                             Clerk

Justice John Warner delivered the Opinion of the Court.

¶1      In 2001, the Montana Department of Environmental Quality (DEQ) issued a Montana Pollution Discharge Elimination System (MPDES) permit to Revett Silver Company authorizing Revett to discharge water into the Clark Fork River from its proposed mine, the Rock Creek Mine. The Appellants, four organizations with interests in protecting the Clark Fork River (collectively, the Coalition), brought suit against DEQ alleging, *inter alia*, that the MPDES permit issued to Revett violated the Montana Water Quality Act (WQA). The Coalition now appeals from an order of the First Judicial District, Lewis and Clark County, granting summary judgment to DEQ and holding that the MPDES permit issued to Revett for its proposed Outfall 001 does not violate the WQA.

## ISSUES

¶2      We consolidate and restate the issues presented as follows:

¶3      1. Should this Court give deference to DEQ's interpretation of Admin. R. M. 17.30.715 in determining whether a proposed action will result in nonsignificant changes in water quality?

¶4      2. Does Admin. R. M. 17.30.715, as interpreted by DEQ and applied in this case, violate the nondegradation provisions of the Montana Water Quality Act?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5      Revett Silver Company, formerly Sterling Mining Company, has proposed construction of the Rock Creek Mine, a silver/copper mine to be located in the Cabinet Mountains of northwestern Montana adjacent to the Cabinet Mountain Wilderness Area.

2

Revett proposes to bore an adit, or horizontal mine shaft, for approximately three miles under the Cabinet Mountains where it will extract ore and transport it through the adit to a mill for processing. The mine's production life is anticipated to be thirty to thirty-seven years. Once the adit is completed, it will begin discharging water. According to the DEQ's analysis, the discharge of water will continue for years after the mine closes and it may well be perpetual. The discharged water is expected to contain arsenic, ammonia, nitrate-nitrogen, and heavy metals among other pollutants, which will exceed allowable water quality standards if the discharged water is not treated to remove contaminants.

¶6    The Clark Fork River lies southwest of the proposed mine, and Revett has proposed discharging the water from the mine into the river. Revett proposes to first transport the water to a treatment plant and, after nearly all of the pollutants are removed, put the treated water into the Clark Fork River using a diffuser which would disburse the water across the width of the river.

¶7    Prior to permitting Revett to conduct mining activities, DEQ prepared an Environmental Impact Statement (EIS) and a supplemental EIS. DEQ also required Revett to apply for an MPDES permit that would allow the discharge of water into the Clark Fork River.

¶8    On December 1, 2001, DEQ issued a Record of Decision (ROD), based on the EIS, which established the preferred alternative for the Rock Creek Mine and announced the decision that the MPDES permit would be issued as the proposed discharge of water into the Clark Fork River was deemed nonsignificant.

¶9    Under the permit as approved, either the Outfall 001 adit, which remains at issue in this case, would be plugged, or the water would continue to be discharged to the Clark Fork River. The ROD concedes that it is uncertain whether it is possible to plug the adit, and, if it cannot be plugged, it is unknown how long the discharge would continue after the mine is closed. Thus, on-going monitoring and treatment would be required to ensure that the water quality meets the necessary standards. The discharged water will require treatment until it stops coming out of the mountains or meets water quality standards without treatment, whenever, or if ever, that may occur. Therefore, the EIS assumes, and the ROD requires, that treatment continue in perpetuity.

¶10    When the ROD was issued, DEQ granted Revett an MPDES permit which authorizes discharge of treated waste water into the Clark Fork River at five different outfall points. Only the outfall designated as Outfall 001 remains at issue in this litigation. Outfall 001 would consist mainly of ground water discharged from the three mile long mine adit, domestic waste water, and storm water, as well as a smaller amount of water used to process ore. The discharges from Outfall 001 are projected to range from 4 to 2,300 gallons per minute. The MPDES permit was issued on the presumption that the ground water discharges will be perpetual and cannot be stopped once Revett bores the adit and begins mining.

¶11    The WQA generally requires DEQ to conduct a nondegradation review prior to issuing an MPDES permit. Nondegradation review is a rigorous process designed to examine the various alternatives available to complete a specific proposed project that will

4

diminish water quality. The review examines social costs as well as economic costs involved in a project. It also considers whether a particular project is necessary and advisable.

¶12   Section 75-5-301(5)(c), MCA, provides that the Board of Environmental Review (BER) shall establish criteria for determining whether a proposed activity will result in nonsignificant changes in water quality. If a proposed activity is determined to involve only nonsignificant changes, nondegradation review is not required.

¶13   The statutory criteria the legislature has required BER to consider in deciding whether a proposed discharge of water is nonsignificant include: an examination of the potential for harm to human health; the quantity and the strength of the pollutant; the length of time the degradation will occur; and the character of the pollutant. Section 75-5-301(5)(c), MCA. To comply with its statutory mandate to establish criteria for determining whether a proposal will result in only nonsignificant changes in water quality, BER adopted Admin. R. M. 17.30.715.

¶14   Applying Admin. R. M. 17.30.715, DEQ determined that Revett's proposed discharges would result in nonsignificant degradation of the Clark Fork River. Therefore, DEQ issued the MPDES permit to Revett without conducting non-degradation review.

¶15   DEQ based its conclusion that the discharge would not cause significant degradation to the Clark Fork River on the information gathered in the EIS, which says that the water coming from the mine can and will be treated so that pollutants are removed before the water is discharged into the river. The EIS and the ROD also call for the construction of an evaluation adit, which will allow further evaluation of the expected levels of water pollution.

5

This will allow for further decisions concerning the necessary water treatment required if the main ore adit is completed.

¶16    A complete mine closure plan has not yet been formulated. The EIS indicates that a closure plan will be formulated if and when the mine is opened and more information becomes available. However, the ROD upon which the MPDES permit was issued incorporates an initial mine closure plan, which assumes Revett will be required to treat the mine water in perpetuity.

¶17    On March 21, 2002, the Coalition filed an amended complaint challenging issuance of the MPDES permit. The complaint also alleged violations of the WQA and the Montana Constitution; those allegations were subsequently dismissed by stipulation and are not at issue here.

¶18    On August 11, 2005, the Coalition moved for partial summary judgment regarding three of the permitted outfalls, including Outfall 001. The Coalition argued that the MPDES permit for Outfall 001 was improper because, in determining that the proposed discharge was nonsignificant, and thus issuing the permit without conducting a nondegradation review, DEQ did not adequately consider the length of time the proposed discharge would last. On March 24, 2006, the District Court denied the Coalition's motion for summary judgment as to Outfall 001 and granted DEQ's motion for summary judgment concluding that it had correctly issued the MPDES permit on Outfall 001. On October 9, 2006, pursuant to stipulation, the District Court dismissed the remaining claims and entered a final judgment

that the MPDES permit for Outfall 001 did not violate the WQA. The Coalition filed a timely appeal of the judgment.

## STANDARDS OF REVIEW

¶19 Summary judgment is appropriate when there are no material facts in dispute and the movant is entitled to judgment as a matter of law. We review de novo a district court's ruling on a summary judgment motion, applying the same criteria as the district court. *Mont. Trout Unlimited v. Mont. Dept. of Nat. Resources & Conserv.*, 2006 MT 72, ¶ 17, 331 Mont. 483, ¶ 17, 133 P.3d 224, ¶ 17. We review the district court's conclusions of law to determine if they were correct. *Mont. Trout Unlimited*, ¶ 17. In this case, there are no material facts at issue. While DEQ does not concede that the discharge of water from Outfall 001 containing high levels of pollutants will be perpetual, it does not dispute that the EIS and ROD assume that this will be the case. The MPDES permit was issued on such assumption.

¶20 An agency's interpretation of its rule is afforded great weight, and the court should defer to that interpretation unless it is plainly inconsistent with the spirit of the rule. The agency's interpretation of the rule will be sustained so long as it lies within the range of reasonable interpretation permitted by the wording. *Kirchner v. Mont. Dept. Pub. Health & Human Servs.*, 2005 MT 202, ¶ 18, 328 Mont. 203, ¶ 18, 119 P.3d 82, ¶ 18; *Juro's United Drug v. Mont. DPHHS*, 2004 MT 117, ¶ 12, 321 Mont. 167, ¶ 12, 90 P.3d 388, ¶ 12; *Easy v. Mont. DNRC*, 231 Mont. 306, 309, 752 P.2d 746, 748 (1988). Conversely, of course, neither this Court nor the district court must defer to an incorrect agency decision. *Juro's*, ¶ 12;

7

*Grouse Mountain Assocs. v. Mont. Dept. of Pub. Serv. Reg.*, 284 Mont. 65, 69, 943 P.2d 971, 973 (1997).

¶21     We review an agency decision not classified as a contested case under the Montana Administrative Procedure Act[1] to determine whether the decision was "arbitrary, capricious, unlawful, or not supported by substantial evidence." *Johansen v. State*, 1999 MT 187, ¶ 11, 295 Mont. 339, ¶ 11, 983 P.2d 962, ¶ 11.  In reviewing an agency decision to determine if it survives the arbitrary and capricious standard, we consider whether the decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *North Fork Pres. Assn. v. Dept. of State Lands*, 238 Mont. 451, 465, 778 P.2d 862, 871 (1989) (quoting *Marsh v. Or. Nat. Resources Council*, 490 U.S. 360, 378, 109 S. Ct. 1851, 1861 (1989)).  While our review of agency decisions is generally narrow, we will not "automatically defer to the agency 'without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision.'" *Friends of the Wild Swan v. DNRC,* 2000 MT 209, ¶ 28, 301 Mont. 1, ¶ 28, 6 P.3d 972, ¶ 28 (quoting *Marsh*, 490 U.S. at 378, 109 S. Ct. at 1861) (hereinafter *Friends of the Wild Swan I*).

## DISCUSSION

---

[1] "Contested cases" involve adjudicatory proceedings for a determination of legal rights, duties, or privileges of a party.  Section 2-4-102(4), MCA.  The decision to issue the MPDES permit in this instance does not fall within the category of contested cases.

¶22 *Issue 1: Should this Court give deference to DEQ's interpretation of Admin. R. M. 17.30.715 in determining whether a proposed action will result in nonsignificant changes in water quality?*

¶23 Conceding that there is no Montana authority on point, the Coalition urges this Court to adopt a new standard of review for environmental matters in which no deference is given to DEQ's interpretation of rules adopted by BER, including Admin. R. M. 17.30.715. The Coalition argues that, because the Court held in *Montana Environmental Information Center v. Mont. DEQ*, 1999 MT 248, 296 Mont. 207, 988 P.2d 1236 (hereinafter *MEIC*), environmental rights stated in Article II, Section 3 and Article IX, Section 1 of the Montana Constitution are fundamental rights, any statute or rule implicating the environment must be subjected to a strict scrutiny analysis by the courts. *MEIC*, ¶ 63. Thus, argues the Coalition, no deference can be given to DEQ's interpretation of Admin. R. M. 17.30.715.

¶24 In *MEIC*, the Court held, to the extent § 75-5-317(2)(j), MCA (1995), arbitrarily excluded certain activities from nondegradation review without regard to the nature or volume of the substances being discharged, it violated environmental rights guaranteed by Article II, Section 3 and Article IX, Section 1 of the Montana Constitution. The Court specifically limited its holding to § 75-5-317(2)(j), MCA (1995), as applied to the facts in *MEIC*. *MEIC,* ¶ 80. The Coalition, in essence, argues that the courts must examine the environmental decisions of DEQ without granting deference to DEQ's expertise and experience in the protection of the environment under legislative guidelines.

¶25 In this case, the Coalition asks this Court to mis-apply *MEIC*. The coalition has neither challenged the constitutionality of § 75-5-301(5)(c), MCA, or Admin. R. M. 17.30.715 nor alleged that BER or DEQ excluded from review the nature or volume of the substances Revett proposes to discharge into the Clark Fork River.

¶26 In this action, the Coalition seeks to have this Court reverse the District Court and hold that the discharge from Outfall 001 must undergo full nondegradation review because of the assumed perpetual nature of the discharge. The Coalition argues in the alternative that DEQ erroneously interpreted Admin. R. M. 17.30.715, and that its decision to issue an MPDES permit to Revett was arbitrary and capricious. Therefore, in this instance, the Court is asked to examine whether DEQ's interpretation of Admin. R. M. 17.30.715 is correct, and whether its application of that regulation is arbitrary and capricious. Such an examination does not require the application of one of the three levels of scrutiny applied to statutes on constitutional challenge.

¶27 The decisions for the Court in this case fall squarely within the established standards noted in ¶¶ 19, 20 above. This Court defers to an agency's interpretation of one of its regulations, unless such interpretation is plainly inconsistent with the spirit of the regulation. The agency's interpretation of a regulation "will be sustained so long as it lies within the range of reasonable interpretation permitted by the wording." *Kirchner*, ¶ 18. However, we will not defer to an incorrect agency decision. *Juro's*, ¶ 12. Likewise, in examining whether an agency decision applying a regulation was arbitrary or capricious, the courts consider whether the decision was based on a consideration of the relevant factors and whether there

10

has been a clear error of judgment. The inquiry must be searching and careful, but the ultimate standard of review is a narrow one. The courts do not substitute their judgment for that of the agency by determining whether its decision was correct. Rather, the courts examine the decision to determine if it was made on sufficient information, or whether the decision was so at odds with the information gathered that it could be characterized as arbitrary or the product of caprice. *North Fork Pres. Assn.*, 238 Mont. at 465, 778 P.2d at 871.

¶28 Considering the Coalition's as applied challenges to DEQ's decision to issue Revett an MPDES permit for Outfall 001 pursuant to § 75-5-301(5)(c), MCA, and Admin. R. M. 17.30.715, we decline to adopt new standards for review of agency decisions which concern environmental matters.

¶29 *Issue Two: Does Admin. R. M. 17.30.715, as interpreted by DEQ and applied in this case, violate the nondegradation provisions of the Montana Water Quality Act?*

¶30 The federal Clean Water Act (CWA) mandates that states manage water pollution in two ways. First, states must control the discharge of pollutants into waters of the United States through a permitting process. 33 U.S.C. § 1342. In Montana, the DEQ administers this requirement of the CWA by use of a permitting system which results in the issuance or denial of an MPDES permit such as the one at issue here.

¶31 Second, in addition to issuing permits controlling discharges, states are required to establish water quality standards to prevent degradation of waters and protect the designated uses of the water. 33 U.S.C. § 1313(c). The United States Environmental Protection Agency

11

(EPA) has established three different tiers of water quality, and each tier must meet a specific set of antidegradation standards. 40 C.F.R. § 131.12. The Clark Fork River, at issue here, is classified as Tier 2. Tier 2 waters are considered high quality waters. States must maintain Tier 2 water at a level that supports propagation of fish, shellfish, and wildlife and recreation in and on the water unless lower water quality is necessary to accommodate important economic or social development. 40 C.F.R. § 131.12(a)(2).

¶32 Montana has implemented the federal nondegradation policy by enacting the Montana WQA. *See* § 75-3-301, MCA, *et seq.* Under Montana law, the DEQ cannot authorize degradation of Tier 2 waters such as the Clark Fork River unless, in the nondegradation review process, the party proposing the degradation demonstrates, by a preponderance of evidence:

> (a)  degradation is necessary because there are no economically, environmentally, and technologically feasible modifications to the proposed project that would result in no degradation;
> (b)  the proposed project will result in important economic or social development and that the benefit of the development exceeds the costs to society of allowing degradation of high-quality waters;
> (c) existing and anticipated use of state waters will be fully protected; and
> (d) the least degrading water quality protection practices determined by the department to be economically, environmentally, and technologically feasible will be fully implemented by the applicant prior to and during the proposed activity.

Section 75-5-303(3), MCA. Nondegradation review would require Revett's proposed discharges to meet significantly higher standards to justify construction of the mine. Also, nondegradation review would require the proposed mine to undergo greater public scrutiny than is required by the MPDES permit at issue here.

12

¶33     Montana law establishes two exceptions to the rule that proposals to discharge into Tier 2 waters must undergo nondegradation review under § 75-5-303, MCA. First, the Montana legislature has established categories of activities that are statutorily exempt from nondegradation review. Section 75-5-317, MCA. No statutory exemptions apply here. Second, the 1993 Montana legislature authorized the Montana Board of Environmental Review (BER) to establish criteria to determine whether a particular activity will cause only nonsignificant changes in water quality. Section 75-5-301(5)(c), MCA. The legislature directed that:

> These criteria must be established in a manner that generally:
> (i)   equates significance with the potential for harm to human health, a beneficial use, or the environment;
> (ii)  considers both the quantity and the strength of the pollutant;
> (iii) considers the length of time the degradation will occur;
> (iv) considers the character of the pollutant so that greater significance is associated with carcinogens and toxins that bioaccumulate or biomagnify and lesser significance is associated with substances that are less harmful or less persistent.

Section 75-5-301(5)(c), MCA.

¶34     Pursuant to this statute, the BER promulgated Admin. R. M. 17.30.715 to determine whether a proposed activity results in a nonsignificant discharge. Admin. R. M. 17.30.715(1) provides in part:

> These criteria consider the quantity and strength of the pollutant, the length of time the changes will occur, and the character of the pollutant. Except as provided in (2), changes in existing surface or ground water quality resulting from the activities that meet all the criteria listed below are nonsignificant, and are not required to undergo review under 75-5-303, MCA . . . .

13

The regulation goes on to list the pollutant levels that DEQ must consider when determining if a proposed activity is nonsignificant. An activity must comply with the criteria in Admin. R. M. 17.30.715(1) to be considered nonsignificant. If a proposed activity will degrade water quality by introducing pollutants beyond the levels established in the regulation, the activity is significant and must undergo nondegradation review before DEQ may issue an MPDES permit. Conversely, if an activity will not result in degradation of water quality, the activity may be considered nonsignificant and the permit issued.

¶35    Even though a proposal for discharge complies with Admin. R. M. 17.30.715(1), the regulation also gives DEQ discretion to determine the proposed activity is nonetheless significant based on the factors listed in Admin. R. M. 17.30.715(2). These discretionary criteria include "any other information deemed relevant by the department and that relates to the criteria" listed in subsection (1). Admin. R. M. 17.30.715(2)(g).

¶36    DEQ argued in the District Court, based on the information in the EIS, the proposed discharge at Outfall 001 would not introduce pollutants exceeding the levels established in Admin. R. M. 17.30.715(1) into the Clark Fork River. In reaching this conclusion, DEQ presumed waste water would discharge perpetually and also that such water would be treated perpetually. If these assumptions are correct, the proposed discharge would never result in any degradation of the Clark Fork River and there is no need to conduct a nondegradation review. The District Court, in denying the Coalition's motion for summary judgment, reasoned that, because the proposed discharge from Outfall 001 would meet applicable water quality standards for an indefinite time, DEQ adequately considered the length of time it

14

would occur. The District Court entered summary judgment in favor of DEQ based on this reasoning.

¶37    DEQ states on appeal that the ROD considers the length of time the proposed discharge from Outfall 001 will continue, as required by Admin. R. M. 17.30.715(1), by assuming that it will be perpetual. DEQ then posits, since the proposal asserts the water discharged from Outfall 001 will also be treated perpetually, it will never contain pollutants exceeding established levels. Thus, the discharge is nonsignificant.

¶38    DEQ interprets Admin. R. M. 17.30.715(2)(g), which provides that it has discretion to consider any other information which relates to the criteria in sub-division (1) of the regulation, as limited in application to those few instances where the specific criteria in sub-division (1) fail to account for site-specific conditions or newly acquired information. Based on this interpretation, DEQ refused to exercise its discretion under sub-section (2)(g) of Admin. R. M. 17.30.715 to consider independently of Revett's proposal that the polluted water discharged from Outfall 001: (a) cannot be stopped; (b) will likely discharge up to 3.3 million gallons of water per day into the Clark Fork River; and (c) will require treatment in perpetuity.

¶39    While this Court generally gives respectful consideration to an agency's interpretation of its regulations, *Mont. Power Co. v. Mont. Public Serv. Commn.*, 2001 MT 102, ¶ 25, 305 Mont. 260, ¶ 25, 26 P.3d 91, ¶ 25, we conclude that DEQ's interpretation of Admin. R. M. 17.30.715(2) is incorrect. It is not within the range of reasonable interpretation permitted by the regulation's wording and is plainly inconsistent with the spirit of the rule.

15

¶40    The pollutant levels permitted under Admin. R. M. 17.30.715(1) do incorporate a consideration of the length of time a discharge will continue.  Therefore, the time element of a discharge is implicitly considered as required by § 75-5-301(5)(c)(iii), MCA.  However, DEQ's interpretation of sub-section (2) of the regulation, to the effect that it may not independently consider the relevant facts that the discharge cannot be stopped and will require perpetual treatment, is inconsistent with the spirit of the rule and contrary to the wording of both § 75-5-301(5)(c)(iii), MCA, and Admin. R. M. 17.30.715(1), (2).

¶41    A regulation is to be read in its entirety.  *See Friends of the Wild Swan v. Mont. DEQ*, 2005 MT 351, ¶ 16, 330 Mont. 186, ¶ 16, 127 P.3d 394, ¶ 16 (hereinafter *Friends of the Wild Swan II*).  Sub-division (2) of Admin. R. M. 17.30.715 provides:

> Notwithstanding compliance with the criteria of (1), the department may determine that the change in water quality resulting from an activity which meets the criteria in (1) is degradation based upon the following:
>
> .    .    .
>
>  (g) any other information deemed relevant to the department and that relates to the criteria in (1).

BER recognized when it adopted sub-division (2) that situations arise where the criteria in Admin. R. M. 17.30.715(1) would be inadequate to protect against degradation.  As the BER stated when the regulation went into effect:

> It is unlikely that a set of criteria for nonsignificance can be developed that would sufficiently fulfill the goal of preventing degradation in every instance. Given that implementation of the policy under the rules has yet to be tested, it is important that the [DEQ] have discretion to make a determination of significance independent of the criteria in [17.30.715(1)].

15 Mont. Admin. Register 2209 (Aug. 11, 1994).

¶42 Sub-division (2)(g) of Admin. R. M. 17.30.715 vests in DEQ the discretion to carefully examine and consider, independently of sub-division (1) of the regulation, whether a proposed activity such as the Rock Creek Mine can safely be deemed nonsignificant. In promulgating Admin. R. M. 17.30.715, BER intended DEQ exercise its discretion granted by sub-division (2) to re-evaluate a decision made under sub-division (1) in order to fulfill the goal of preventing degradation in every instance.

¶43 Failure of a district court to exercise discretion is itself an abuse of discretion. *State v. Weaver*, 276 Mont. 505, 509, 917 P.2d 437, 440 (1996); *see also Columbia Falls Elem. Sch. Dist. No. 6 v. State*, 2005 MT 69, ¶ 48, 326 Mont. 304, ¶ 48, 109 P.3d 257, ¶ 48 (Nelson, J., concurring) (stating that a choice not to act is an act itself). Likewise, when an agency, because of a misinterpretation of its rule, does not exercise its discretion it abuses its discretion. In other words, an agency, "vested with discretion, abuses that discretion when it behaves as if it has no other choice than the one it has taken, as well as when it makes a decision for which there is not adequate support." *Bennington Housing Authority v. Bush*, 933 A.2d 207, ¶ 12 (Vermont, 2007); *Litterer v. Judge*, 644 N.W.2d 357, 362 (Iowa, 2002); *See* Charles H. Koch, 3 *Administrative Law and Practice* § 10.6 [3] (2d ed., West 1997) ("Failure to exercise discretion might be an abuse of discretion."); 73A C.J.S. *Public Administrative Law and Procedure* § 416 (2004) ("An agency that has authority to act but fails to exercise that authority based upon a false belief that there is no such authority abuses its discretion."). DEQ's misinterpretation of Admin. R. M. 17.30.715(2) resulted in the agency's refusal to consider, independent of the criteria in sub-division (1), that Revett's

17

proposed discharge of polluted water cannot be stopped and will be perpetual. Under the facts of this case, DEQ's failure to exercise the discretion granted by Admin. R. M. 17.30.715(2), resulted in an arbitrary and capricious decision that the discharge from Outfall 001 will always be nonsignificant.

¶44 The very examples DEQ presented to the Court in support of its erroneous interpretation of Admin. R. M. 17.30.715(1), (2) illustrate its error. DEQ points out that a municipal water treatment plant may last forever and that a sub-division's sewage treatment plant may be required forever. Both require MPDES permits, which can be revoked if pollution occurs. Also, the water will require perpetual treatment. Because the water will always be treated, any discharge will be nonsignificant under Admin. R. M. 17.30.715. DEQ argues these same facts apply in this instance. What DEQ ignores is that, in these examples, someone who is available will always need the water from the treatment plant or a permit from DEQ to discharge sewage. If whoever needs the water or sewage plant does not clean up the water as required, DEQ can revoke the MPDES permit and shut the plant down. However, in the case of Outfall 001, it is a given that the mine will close in a few years, Revett will be gone, and the polluted discharge will continue and cannot be shut off. An independent determination under Admin. R. M. 17.30.715(2)(g) of the significance of the polluted discharge from Outfall 001, after the mine has closed, Revett is gone, and the MPDES permit becomes meaningless is obviously a most excellent idea.[2] It is an arbitrary and capricious decision not to make such an independent examination.

---

[2] Revoking an MPDES permit for a closed mine does nothing to stem pollution. Enforcement actions against an entity that is gone are unavailing.

18

¶45 DEQ alternatively argues that the proposed discharge from Outfall 001 is nonsignificant because Revett is required to provide a bond which will guarantee that funds are available to treat the polluted water as long as necessary. In this regard, the EIS states that it is unlikely the mine discharge would ever meet applicable standards and that treatment in perpetuity would require continued operation and maintenance of the water treatment facility, as well as the pipeline between the mine and the point of discharge. The EIS then makes the observation that the project would require sufficient bonding to cover the need for long-term water treatment. The ROD requires that a reclamation bond for costs associated with wastewater treatment be posted by Revett and maintained at a level adequate for DEQ and the U.S. Forest Service to implement reclamation plans. It goes on to say that the range of the required bond for post-mining wastewater treatment is estimated to be between $14,381,518 and $44,423,628, depending on how long treatment may be required.

¶46 The EIS sets out DEQ's estimates of the costs of running the proposed Anoxic Biotreatment System and the Reverse Osmosis water treatment plant based on the design put forth by Revett's predecessor, Sterling Mining Company. However, no information is given on how these estimated costs, which were used to estimate the possible size of the necessary reclamation bond, were arrived at. Likewise, the ROD contains no information on how the estimated bond requirements were calculated. An exhibit to the ROD seems to state that the estimated annual operating and maintenance costs of water treatment will be $1,200,000, but there is no specific information regarding what was considered to arrive at this amount. There is no indication in the EIS whether the proposed Anoxic Biotreatment and Reverse

19

Osmosis systems Revett plans to use to treat polluted wastewater can be maintained for a substantial number of years, or in perpetuity. There is no analysis concerning whether or when the treatment facilities will require complete replacement. Likewise, there is no examination of other factors which might come into play when it is necessary to perpetually clean a discharge of polluted water that cannot be stopped. There is no consideration of whether it is possible to purchase a bond guaranteeing payment of perpetual treatment costs, while it is known that the principal will close its mine and may become a shell corporation or dissolve. And, there is no record of whether Revett is willing to post in advance the many millions in cash required to pay for perpetual treatment. The ROD does not consider even these obvious problems associated with opening Outfall 001.

¶47 An agency must take a "hard look" at the environmental impacts of a given project or proposal. *Ravalli Cty. Fish & Game Assn., Inc. v. Mont. Dept. of State Lands*, 273 Mont. 371, 377, 903 P.2d 1362, 1367 (1995). Implicit in the requirement that an agency take a hard look at the environmental consequences of its actions is the obligation to make an adequate compilation of relevant information, to analyze it reasonably, and to consider all pertinent data. *Ravalli Cty. Fish & Game Assn., Inc.*, 273 Mont. at 381, 903 P.2d at 1369 (1995) (citing *Sierra Club v. U. S. Army Corps of Engrs.*, 701 F.2d 1011, 1029 (2nd Cir. 1983)). Admittedly, court review of an agency decision, including an environmental decision, is limited. *Friends of the Wild Swan I*, ¶ 28. Still, while a court is not to substitute its judgment for that of the agency, the agency must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the

20

choice made. *Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 2866 (1983). In other words, the Court looks closely at whether the agency has taken a hard look at the question presented. The Court does not take a hard look itself but requires that the agency does so. The Court focuses on the validity and appropriateness of the administrative decision making process without intense scrutiny of the decision itself. In this way, the Court examines the elements of the decision without interfering with the administrative authority over the decision itself. *Koch*, *3 Administrative Law and Practice* at § 10.5.

¶48 An agency must supply a statement of reasons why potential impacts of a proposed action such as Outfall 001 are nonsignificant. *Ravalli Cty. Fish & Game Assn., Inc.*, 273 Mont. at 382, 903 P.2d at 1370. A simple statement that a perpetual discharge of polluted water will always be treated is insufficient to justify a determination that an irreversible discharge is nonsignificant. DEQ has misinterpreted its own regulation and has not taken a hard look at what will be required to maintain the quality of the Clark Fork River after the mine closes and Outfall 001 continues to discharge polluted water, perhaps forever. This includes a failure to take an initial hard look at whether bonding can be a sufficient remedial measure before deciding to issue an MPDES permit on the basis that a discharge is, and will continue to be, nonsignificant.

**CONCLUSION**

¶49 We do not hold that the discharge from Outfall 001 cannot, under any circumstances, be nonsignificant. It is possible that DEQ could, after a further consideration of all facets of

21

Revett's plan, determine that the anticipated discharge from Outfall 001 is nonsignificant under § 75-5-301, MCA, and Admin. R. M. 17.30.715. We do, however, conclude, because DEQ has not made an independent examination of the length of time the proposed discharge of polluted water will continue, as provided for in Admin. R. M. 17.30.715(2), and has not taken a hard look at all of the consequences reasonably anticipated from boring an adit that cannot be plugged, the agency made an arbitrary and capricious decision by issuing an MPDES permit to Revett for Outfall 001.

¶50 The summary judgment in favor of DEQ is reversed and this case is remanded to the District Court for entry of an order remanding consideration of Revett's application for an MPDES permit to DEQ for further proceedings in conformity herewith.

/S/ JOHN WARNER

We Concur:

/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS

Justice Jim Rice concurring in part and dissenting in part.

¶51 I concur with the Court's resolution of Issue 1. Under Issue 2, I concur that Admin. R. M. 17.30.715(1) incorporates a consideration of the length of time a discharge will continue, and thus satisfies the requirement of § 75-5-301(5)(c)(iii), MCA, that such regulatory criteria

22

"generally" consider "length of time." Opinion, ¶¶ 31, 38. I further agree with the Court that DEQ has misinterpreted Admin. R. M. 17.30.715(2) by limiting the application of that provision to instances where the specific criteria in sub-division (1) fail to account for site-specific conditions or newly acquired information. Sub-division (2) of Admin. R. M. 17.30.715 states that "Notwithstanding compliance with the criteria of (1), the department may determine that the change in water quality . . . is degradation based upon . . . any other information deemed relevant to the department. . . ." This language—the department "may determine"—clearly grants the department full discretion to undertake review under sub-division (2) regardless of the outcome under sub-division (1). Thus, DEQ has made an error of law—the misinterpretation of a regulation.

¶52 I depart from the Court over the order it ultimately enters because, after properly interpreting the regulation as granting DEQ discretion to act, and thereby correcting the department's error of law, the Court then takes upon itself the task of exercising the very discretion which we have just explained belongs to DEQ, deciding that DEQ *must* act—it *must* engage in nondegradation review under sub-division (2). However, the regulation specifically provides that DEQ *may* act, and the Court has thus exercised discretion belonging to DEQ.

¶53 The Court is doing what it says it will not do. Despite acknowledging that a court should not substitute its judgment for that of an agency, the Court puts on its environmental hat and does just that—reviews the facts and decides that the appropriate action is for DEQ to undertake with regard to Outfall 001 is to proceed with nondegradation review. Whether

23

nondegradation review should be undertaken pursuant to sub-division (2) is a discretionary decision for the agency to make. This Court can review the exercise of that discretion for abuse if DEQ's decision is later challenged on appeal, but we should not be making the decision in the first instance.

¶54 The Court has exceeded its authority and acted contrary to the cases it cites. In *Weaver*, we held the district court abused its discretion by failing to act upon a defendant's motion to withdraw his guilty pleas. *State v. Weaver*, 276 Mont. 505, 917 P.2d 437 (1996). Rather than ruling on the motion ourselves, we sent the case back to the district court to undertake its proper duty. *Weaver*, 276 Mont. at 509, 917 P.2d at 440. The Court cites to language within *Columbia Falls Elementary Sch. Dist. No. 6 v. State*, 2005 MT 69, ¶ 44, 326 Mont. 304, ¶ 44, 109 P.3d 257, ¶ 44, about the failure to exercise discretion but, actually, that decision illustrates the Court's error. We held in *Columbia Falls* that the Legislature had failed to act within its discretion to define "quality education." *Columbia Falls*, ¶ 31. Rather than stepping into the Legislature's shoes and drafting the definition of "quality" ourselves, we required the Legislature to define the term, as was its duty. *Columbia Falls*, ¶ 31. Similarly, regarding agencies, we have held:

> The reviewing court has the duty to determine whether the agency applied the appropriate law and whether its findings of fact are sufficient to justify the agency's rulings. When the court determines that the agency's findings are insufficient or that the agency applied the wrong law, it may not use the opportunity to usurp the agency's role as the trier of fact.

*Stewart v. Region II Child & Fam. Servs.*, 242 Mont. 88, 94, 788 P.2d 913, 917 (1990).

24

¶55 The briefing in this case explains that nondegradation review is an extensive process. Requiring that process on our own, without the benefit of a factual record on that question and without benefit of the agency's expertise, is a shot in the dark. We should let the agency exercise its discretion on that issue and act first, in accordance with the corrected interpretation of the regulation we have provided. Fortunately, the Court bases its holding requiring the Department to proceed under (2) "on the facts of this case," ¶ 40, from which I draw the conclusion that the Court is not requiring the Department to undertake review under (2) in every case. From now on, apparently, the Department will be able to properly exercise its discretion in that regard.

¶56 I concur and dissent.


/S/ JIM RICE


Chief Justice Karla M. Gray joining in the concurring and dissenting Opinion of Justice Rice.


/S/ KARLA M. GRAY