JUSTICE WHEAT
delivered the Opinion of the Court.
¶1 Revett Silver Company and RC Resources, Inc., (collectively “Revett”) appeal from an order issued by the First Judicial District Court, Lewis and Clark County, granting summary judgment in favor of the Clark Fork Coalition, Earthworks, Trout Unlimited and Rock Creek Alliance (collectively “Plaintiffs”). We affirm.
BACKGROUND
1. Legal Background
¶2 The Montana Water Quality Act makes it unlawful to cause pollution of any state waters from a point source without a valid Montana Pollutant Discharge Elimination System (MPDES) permit. Section 75-5-605(2)(c), MCA. Under the MPDES program the Department of Environmental Quality (DEQ) may issue permits for storm water discharges associated with construction activity. Admin. R. M. 17.30.1105 (2008). Storm water discharge associated with construction activity is a discharge of storm water runoff, snow melt runoff, or surface runoff and drainage into state waters as a result of construction activities including clearing, grading, and excavation that result in the disturbance of an acre or more of total land area. Admin. R. M. 17.30.1102(27), (28) (2008).
¶3 Any person who discharges or proposes to discharge storm water associated with construction activity must obtain either an individual *429 permit or a general permit. Admin. R. M. 17.30.1105(l)(a); See also Admin. R. M. 17.30.1341(l)(j) (2008). In order to operate under an individual permit, a person must submit a detailed application, including analysis of the proposed discharge and site-specific controls to ensure the discharge will not violate water quality standards. Admin. R. M. 17.30.1322 (2008). Whereas to operate under a general permit for storm water discharge associated with a construction activity, a person must only submit a notice of intent together with a pollution control plan. Admin. R. M. 17.30.1115 (2008). In place of the detailed site-specific controls provided by an individual permit, a general permit requires only that a storm water discharger follow standard best management practices (BMPs) that DEQ has found generally sufficient to meet water quality standards across the state. Admin. R. M. 17.30.1115.
¶4 However, DEQ may not issue a general permit if the “point source will be located in an area of unique ecological or recreational significance.” Admin. R. M. 17.30.1341(4)(e). The determination of whether an area is of unique ecological or recreational significance is based upon considerations of Montana stream classifications, impacts on fishery resources, local conditions at proposed discharge sites, and designations of wilderness areas or of wild and scenic rivers. Admin. R. M. 17.30.1341(4)(e).
2. Factual and Procedural Background
¶5 The Rock Creek Mine was initially proposed in the late 1980s with the goal of extracting copper and silver from the Cabinet Mountains. After the mine was initially proposed, various state and federal agencies spent more than a decade examining the potential impacts that the mine would have on the surrounding environment, including Rock Creek, the lower Clark Fork River, and the adjacent Cabinet Wilderness Area. This review culminated in September 2001 when DEQ and the U.S. Forest Service issued a final draft of a joint Environmental Impact Statement (EIS).
¶6 As described in the EIS, the mine would be developed in two phases. In the first phase, the exploration phase, Revett would drill an 18-foot wide, 1.25 mile long, evaluation adit, or mine shaft, to reach the ore body. The adit would generate substantial volumes of waste rock and ore. In the second phase, the production phase, Revett would drill parallel tunnels beginning at the confluence of the east and west forks of Rock Creek and extending some three miles beneath the Cabinet Mountains. Revett would then begin excavating the mine at a rate of approximately 10,000 tons of ore per day for an estimated 30 years.
*430 ¶7 The majority of the infrastructure associated with the mine will be constructed in the Rock Creek watershed. Rock Creek has two major branches, the East Fork and the West Fork, and is itself a tributary of the Clark Fork River near Noxon, Montana. The evaluation adit is located up the West Fork of Rock Creek, and the excavation tunnels are located at the confluence of the East and West Forks. Revett also plans to construct a milling facility at the confluence. Access to the milling site is provided by Forest Service road 150 and a combination of Forest Service roads 150 and 2741 provide access to the evaluation adit site. Forest Service road 150 parallels Rock Creek, and upstream from the confluence it parallels the West Fork of Rock Creek. Road 2741 branches off of Forest Service road 150 and extends nearly to the evaluation adit site. In order to use these roads, the EIS notes that Revett would need to improve them. This would include, among other things, road widening, installing turnouts, and corner widening.
¶8 Together, Rock Creek and its forks support an important population of bull trout, Salvelinus confluentus. Although previously abundant in western Montana, bull trout populations had dwindled and in 1998 the U.S. Fish and Wildlife Service (USFWS) listed them as threatened in the Columbia River Basin, which includes the Clark Fork River basin and Rock Creek. 63 Fed. Reg. 31647 (June 10,1998); 50 C.F.R. § 17.11(h) (2008). After bull trout were listed as threatened, the Forest Service, as required by Section 7 of the Endangered Species Act (ESA), formally consulted with the USFWS about the mine’s effect on bull trout. The USFWS then released a formal biological opinion (BiOp) regarding the mine’s effects on bull trout in 2000. The USFWS revised and supplemented its findings in succeeding BiOps released in 2003,2006 and 2007. In the 2007 supplement, the USFWS issued a no jeopardy finding and concluded that the development of the mine would not jeopardize the existence of bull trout in the Lower Clark Fork area. Significantly, the agency did not make an explicit finding as to jeopardy to the Rock Creek population of bull trout. Rock Creek Alliance v. United States Forest Serv., 703 F. Supp. 2d 1152, 1200 (D. Mont. 2010).
¶9 Rock Creek is one of only two tributaries, the other being Bull River, that support bull trout populations in the drainage of Cabinet Gorge Reservoir. According to the Montana Department of Fish, Wildlife and Parks (FWP), the Rock Creek and Bull River populations are the only two stocks in the surrounding area that have enough individuals to avoid a significant risk of extinction. Of these two, the Rock Creek stock is “considered unique (relative to Bull River)... [and *431 it] is unlikely that bull trout would quickly recolonize Rock Creek if they became extirpated there.” In the final EIS, DEQ and the Forest Service similarly concluded:
Rock Creek is an essential stock for conservation purposes. Not only is the species more abundant than elsewhere locally, but Rock Creek is also in better condition physically. Given that these data also show that Rock Creek is well within the range of conditions preferred by the species, while most other streams are not, we support the findings of the State of Montana that Rock Creek is one of the two watersheds where conservation efforts should focus on recovery of the migratory hull trout.
(Emphasis added.)
¶10 Despite the importance of Rock Creek, habitat conditions for bull trout in Rock Creek are already on the edge because of past sediment deposition in the creek. Excessive sediment destroys bull trout’s preferred spawning habitat of low gradient reaches of mountain valley streams with clean gravel and cobbly substrate. Fine sediments clog the spaces between the gravel and cobble needed by incubating eggs and fry. If sediment is deposited into interstitial spaces during incubation, it impedes water movement through the gravel, lowers the levels of dissolved oxygen, and inhibits the removal of metabolic waste. Even if an embryo incubates and develops successfully, the emerging fry can be entombed by the sediment. Juvenile and adult bull trout are also adversely affected.
¶11 Due to the already at-risk status of Rock Creek, any additional sediment deposition could threaten its bull trout population. In the 2000 BiOp, the USFWS concluded that “[a]ny increase in sediment deposition is a risk to bull trout habitat productivity and survival rate.” Similarly, FWP stated, “Additional impacts [from an increase in sediment] could result in irreversible consequences.” These consequences are particularly troublesome because, as noted by the Forest Service and DEQ, “the loss of Rock Creek as a spawning and rearing tributary could push the bull trout further towards elimination in this drainage.” And, once eliminated, it is unlikely that bull trout would quickly recolonize the creek.
¶12 In light of the bull trout’s precarious state, any action by Revett that results in sediment being deposited in Rock Creek could potentially extirpate bull trout from the Creek. Herein lays the potential problem for Revett, construction related to Phase I of the mine-in particular road improvements-will likely lead to a discharge of sediment to the West Fork of Rock Creek for several years. The USFWS, in the 2007 supplemental BiOp, states:
*432 The most obvious direct impact of the construction and operation of the Rock Creek Mine to bull trout is the potential for an increased level of fine sediment entering the stream during the 5-year construction phase. Activities associated with the development of the mine include road construction, road reconstruction, bridge and culvert replacement [and] alteration of existing roads to conform to Best Management Practices (BMPs), and construction and development of tailings ponds, adit and mill sites, powerlines, and pipelines.
(Emphasis added.) Continuing, the BiOp notes that this increase in sediment levels “could reach a level to cause morphological channel changes (e.g., filling of pools, substrate embeddedness) that reduce the quality of rearing and foraging habitat for bull trout. During this same period, degradation in the quality of spawning habitat is likely due to deposits of fine sediment in spawning gravels.” As a result, the USFWS concluded that increases in sedimentation “are anticipated to adversely affect and likely result in a take of the egg, larval and juvenile life history stages by harming or impairing feeding, breeding and sheltering patterns of adult and juvenile bull trout.” Similarly, FWP concluded that the high levels of sediment input during the initial phase of the mine may “result in permanent loss of the Rock Creek bull trout stock.”
¶13 In order to avoid these potentially disastrous consequences, the Forest Service and DEQ plan requires Revett to undertake BMPs to avoid sediment deposition. However, the Forest Service and DEQ admit that, even if Revett utilizes BMPs, bull trout in Rock Creek will be adversely affected because of “unavoidable fugitive sediment loading during project construction.” The 2007 BiOp also notes that during construction, short-term increases in sediment are unavoidable. This is because construction of the mitigation measures themselves will result in short-term increases in sediment and because the BMPs are less than 100 percent effective.
¶14 Prior to reconstructing the Forest Service roads, and increasing sediment deposition in Rock Creek, Revett submitted a Notice of Intent (NOI) to DEQ requesting approval to discharge sediment to Rock Creek for Phase I construction activities including:
road improvements to the existing unpaved [Forest Service] access roads to the adit site, road widening at a number of identified locations to improve safety and access, borrow material sites adj acent to the access road, installation of a buried powerline and water pipeline in the access road, installation of arch culverts at three locations[,] road surfacing to reduce sediment yield from *433 the road surface, installation of rolling dips as required by the [Forest Service],... and construction of an infiltration pond system for discharge of treated adit (mine) water to groundwater.
Revett sought approval -under the General Permit for Storm Water Discharges Associated with Construction activity, also known as General Permit MTR 100000. As required by § 75-5-401(c), MCA, Revett submitted stormwater pollution prevention plan with its NOI. On August 22, 2008, DEQ approved the NOI and pollution prevention plan.
¶15 The Plaintiffs, in anticipation of Revett seeking approval for mine-related construction under General Permit MTR 100000, filed this action against DEQ on June 9, 2008. Revett subsequently intervened as a defendant. In the complaint, the Plaintiffs sought a declaratory judgment that use of general permits to approve stormwater runoff from the Rock Creek Mine would violate Admin. R. M. 17.30.1341(4)(e) because Rock Creek is an area of “unique ecological significance” based on considerations of impacts on fishery resource and local conditions at proposed discharge. On July 21, 2011, the District Court granted summary judgment to the Plaintiffs and declared the general permit void. The court found that DEQ’s approval of discharges associated with road,reconstruction violated Admin. R. M. 14.30.1341(4)(e) because Rock Creek is of “unique ecological significance because of its impacts on fishery resources and local conditions at the proposed discharge site.”
¶16 Revett appeals, and raises the following issue:
¶17 Did the District Court err when it granted summary judgment to the Plaintiffs?
STANDARD OF REVIEW
¶18 We review a district court’s grant of summary judgment de novo, applying the same criteria as the district court. N. Cheyenne Tribe v. Mont. Dep’t of Envtl. Quality, 2010 MT 111, ¶ 18, 356 Mont. 296, 234 P.3d 51. A district court properly grants summary judgment only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. N. Cheyenne Tribe, ¶ 18.
¶ 19 An agency’s interpretation of its rule is afforded great weight, and we will defer to that interpretation unless it is plainly inconsistent with the spirit of the rule. Clark Fork Coalition v. Dep’t of Envtl. Quality, 2008 MT 407, ¶ 20, 347 Mont. 197, 197 P.3d 482. We will sustain an agency’s interpretation of a rule so long as it lies within the range of reasonable interpretation permitted by the wording. Clark Fork Coalition, ¶ 20. Of course, we need not defer to an incorrect *434 agency interpretation. Clark Fork Coalition, ¶ 20.
¶20 We review an agency decision not classified as a contested case under the Montana Administrative Procedure Act to determine whether the decision was arbitrary, capricious, unlawful or not supported by substantial law. Clark Fork Coalition, ¶ 21. In reviewing an agency decision under the arbitrary and capricious standard, we consider whether the decision was “based on a consideration of the relevant factors and whether there has been a clear error of judgment.” N. Fork Preservation Ass’n v. Dep’t of State Lands, 238 Mont. 451, 465, 778 P.2d 862, 871 (1989) (citing Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378, 109 S. Ct. 1851, 1861 (1989)). Although our review of agency decisions is narrow, we will not automatically defer to the agency ‘ “without carefully reviewing the record and satisfying [ourselves] that the agency has made a reasoned decision ....’” Friends of the Wild Swan v. Department of Natural Res. & Conservation, 2000 MT 209, ¶ 28, 301 Mont. 1, 6 P.3d 972 (quoting Marsh, 490 U.S. at 378, 109 S. Ct. at 1861).
DISCUSSION
¶21 As a preliminary matter, Revett argues that the District Court failed to defer to DEQ’s expertise in the area of water quality and permitting activities. However, since we review a district court’s grant of summary judgment de novo, and we defer to an agency’s interpretation of its own rule, it is immaterial whether the District Court deferred to the DEQ.
¶22 Revett also argues as a threshold matter that the District Court failed to set forth the facts or grounds that support its decision such that meaningful appellate review can be made. See Johnston v. American Reliable Ins. Co., 248 Mont. 227, 229, 810 P.2d 1189, 1191 (1991). To the contrary, the District Court made clear that it determined Rock Creek was an area of “unique ecological significance” based on the impacts on fishery resources and local conditions at the discharge site. It set forth specific facts from the 2007 Supplement BiOp in support of its position. Accordingly, the District Court did not err.
¶23 The remainder of Revett’s appeal focuses on the District Court’s conclusion that because Rock Creek is an area of unique ecological significance, the general permit approval issued by DEQ is void. Revett contends that the mere presence of bull trout alone is not sufficient to justify the conclusion that Rock Creek is an area of unique ecological significance because the USFWS issued a no jeopardy finding in its BiOp for the project, meaning that the project would not endanger bull *435 trout as a species. Revett additionally argues that the implementation of BMPs during road construction would limit sediment deposition, and over the life of the mine would eventually decrease sediment loads in Rock Creek.
¶24 The plaintiffs argue that Rock Creek is of unique ecological significance because, as the District Court concluded, the fishery itself is unique and bull trout habitat conditions are already on the edge. ¶25 DEQ may not approve the use of a general permit in an area of unique ecological significance. Admin. R. M. 17.30.1341(4)(e). To determine whether an area is of unique ecological significance DEQ must take into consideration Montana Stream classifications, impacts on fishery resources, local conditions at the proposed discharge site, and designations of wilderness area or of wild and scenic rivers. Admin. R. M. 17.30.1341(4)(e). The District Court relied exclusively on considerations of the impacts on fishery resources and the local conditions at the proposed discharge sites to find that Rock Creek is an area of unique ecological significance.
¶26 Rock Creek’s fishery resource is by all accounts a unique resource. In the final EIS, DEQ described Rock Creek’s bull trout population as “an essential stock for conservation purposes,” and that it is the stronger of the “only two stocks in the Lower Clark Fork considered to have enough individuals to avoid significant risk of extinction.” Compared to the only other such stock, the “Rock Creek stock is considered unique.” Though the Rock Creek stock may be at risk of extirpation, and has a limited population of adfluvial bull trout, DEQ specifically noted that Rock Creek is an area “where conservation efforts should focus on recovery of the migratory bull trout.” Thus, it is not the mere presence of bull trout, as argued by Revett, that make Rock Creek unique, but instead it is this specific population of bull trout, and the possibility of recovery of an adfluvial population of bull trout that make Rock Creek a unique fishery resource.
¶27 In addition, considerations of “conditions at the proposed discharge site” warrant a conclusion that the area is of unique ecological significance. Presently, Rock Creek is already loaded with sediments and as a result, FWP has warned that “habitat conditions are already on the edge” and “[a]dditional impacts could result in irreversible consequences.” The USFWS has similarly concluded that “any increase in sediment deposition is a risk to bull trout habitat productivity and survival rate.” This is particularly troublesome because, as noted in the final EIS, “the loss of Rock Creek as a spawning and rearing tributary could push the bull trout further towards elimination in [the] drainage.” The risk of extirpation of a *436 unique population of already at-risk bull trout further justifies the finding that Rock Creek is an area of unique ecological significance. ¶28 Revett argues that the implementation of BMPs will minimize any risk to bull trout in the short term and that in the long term, road reconstruction will ultimately benefit bull trout. Even with the implementation of BMPs-which will not eliminate sediment loading entirely-the “habitat impacts caused by an increase in sediment loading ... would occur sometime during the first five years when site disturbance is greatest due to construction of roads and facility development.” (Emphasis added.) Moreover, FWP and the USFWS have predicted that road reconstruction and implementation of BMPs will result in further sedimentation of Rock Creek and may result in the permanent loss of bull trout, making it irrelevant that sediment loading will be reduced at the end of the project.
¶29 Accordingly, we conclude that DEQ’s approval of the use of General Permit MTR 100000 to allow storm water discharges was arbitrary and capricious because DEQ failed to consider the relevant factors set forth in the law prior to its decision, and as a result, committed a clear error of judgment. Because DEQs interpretation was incorrect, we owe their interpretation of Admin. R. M. 17.30.1341(4)(e) no deference.
CONCLUSION
¶30 For the reasons stated above, we affirm the District Court’s grant of summary judgment to the Plaintiffs.
CHIEF JUSTICE McGRATH, JUSTICES NELSON and MORRIS concur.